# United States Court of Appeals

## For the First Circuit

No. 03-2738

PAULO ROCHA PEREIRA DA SILVA ET AL.,

Petitioners,

v.

JOHN ASHCROFT, ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER

OF THE BOARD OF IMMIGRATION APPEALS

Before

Selya, Circuit Judge,

Coffin and Cyr, Senior Circuit Judges.

Kevin R. Murphy on brief for petitioners.
Peter D. Keisler, Assistant Attorney General, Civil Division, Linda S. Wernery, Senior Litigation Counsel, Office of Immigration Litigation, and Kathleen M. Zapata, Trial Attorney, on brief for respondent.

January 5, 2005

**SELYA**, **Circuit Judge**.  Petitioner Paulo Rocha Pereira Da Silva, a Brazilian national, seeks review of a final order of the Board of Immigration Appeals (BIA) rejecting his request for withholding of removal.  Discerning no error, we deny the petition.

## I.

## Background

In November of 1997, the petitioner, previously a domiciliary of Campos, Brazil, entered the United States on a six-month tourist visa.  He took up residence in the Boston area and overstayed his visa.  A year later, he was joined by his wife, Regina Celia Gomes De Lima Silva, and his minor daughter, Paola Lima Rocha Pereira.  They also arrived as tourists and stayed past their respective visa expiration dates.

In September of 2000, the petitioner requested asylum on behalf of himself, his wife, and his daughter.  The Immigration and Naturalization Service (INS) responded by serving a notice to appear.[1]  That notice directed the trio to answer charges that their continued presence in the United States violated the provisions of the Immigration and Nationality Act (INA).  See 8 U.S.C. § 1227(a)(1)(B).  At a hearing before an immigration judge (IJ), the family members admitted through an attorney that they had

---

[1]The Homeland Security Act of 2002, Pub. L. 107-296, § 471, 116 Stat. 2135, 2205 (codified as amended at 6 U.S.C. § 291(a)), abolished the INS and transferred its duties to the Department of Homeland Security.  See Lattab v. Ashcroft, 384 F.3d 8, 13 n.2 (1st Cir. 2004).

overstayed, acknowledged removability, conceded that the application for asylum was time-barred, and sought withholding of removal on the ground that the petitioner had a well-founded fear of future persecution in his native Brazil because of his membership in a particular social group, that is, his status as a "member of society [who] refused to perform illegal tasks simply because of pressure from his immediate supervisors at work."

In support of his application for withholding of removal, the petitioner testified that he had been employed as a part-time accountant for a government-funded drug rehabilitation center in Campos. While carrying out his bookkeeping duties, he learned that the chief executive officer of the center, Fred Luis Mauricio, was embezzling funds. The petitioner aided and abetted the embezzlement by creating phony invoices to account for the missing money. When at long last the Brazilian federal government launched an inquiry into the center's operations, Mauricio threatened to kill the petitioner and his family if he spoke about the corruption.

Despite the threat, the petitioner gave a statement implicating Mauricio to the investigators. Subsequently, his wife was threatened and his apartment ransacked. He reported these incidents to the local office of the military police,[2] who declined

---

[2]According to the United States Department of State Country Reports on Human Rights Practices — Brazil (2001), entered into the administrative record, Brazil's police forces consist of a small,

to afford him special protection because he did not know whether Mauricio was responsible for what had transpired. The petitioner took this refusal as a sign that Mauricio and the local police were conspiring against him and that further requests for police assistance would be an exercise in futility.

Concerned about his safety and that of his family, the petitioner borrowed money from relatives and fled to the United States. His wife and daughter stayed in Brazil, but moved to his brother's house ninety miles from Campos. A year passed without any untoward incidents. At that point, the petitioner's wife and daughter joined him in the United States.

After listening to the petitioner's tale, the IJ found credible those portions of his testimony that recounted facts within his personal knowledge, e.g., that his work situation was corrupt; that he had initially participated in the corruption but later cooperated with the authorities to root it out; that by providing information to the federal police, he had acted as a whistleblower, albeit one with "lesser status" since his whistleblowing began only when it became apparent that he could be prosecuted for his complicity in the ongoing embezzlement; and that Mauricio had threatened him. The IJ explicitly declined to make a

---

primarily investigative federal force and several state police forces (the uniformed members of which are colloquially known as "military police").

finding that Mauricio was responsible for the threat to the petitioner's wife or for the break-in at the petitioner's home.

Despite her acceptance of much of the petitioner's testimony, the IJ refused to embrace many of the conclusions that the petitioner sought to draw from the underlying facts, calling them "mere speculation."  Specifically, she refused to credit the petitioner's self-serving accusation that the local police were in league with Mauricio, observing that no hard evidence of such a tie had been proffered.  She also noted that the petitioner had made no effort to enlist the help of any police department outside of the local area in which Mauricio might have had political influence, thus further weakening his broad-brush claim of police bias.  She then rejected as a matter of law the petitioner's contention that his whistleblower status made him a member of a targeted social group within the purview of 8 U.S.C. § 1231(b)(3)(A).  Finally, she denied his prayer for withholding of removal.[3]

The petitioner appealed.  The BIA adopted the IJ's findings of fact and conclusions of law, adding an independent finding that the feared harm related to what was "essentially a

_____

[3]The IJ also held that the petitioner had not established a basis for relief under Article III of the Convention Against Torture.  Inasmuch as the petitioner did not include this claim in his appeal to the BIA, he has effectively abandoned it.  See Makhoul v. Ashcroft, 387 F.3d 75, 80 (1st Cir. 2004) (stating that "theories not advanced before the BIA may not be surfaced for the first time in a petition for judicial review of the BIA's final order").

personal dispute" between Mauricio and the petitioner.  For that reason, any threats that had been made against the petitioner and his family were insufficient to establish a well-founded fear of future persecution.

After the BIA affirmed the IJ's order, this petition for judicial review eventuated.[4]  See 8 U.S.C. § 1252(a)(1), (b).

## II.

## Analysis

Under the INA, an otherwise deportable alien may avoid removal if the Attorney General determines that "the alien's life or freedom would be threatened in [the destination] country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  Id. § 1231(b)(3)(A).  The applicant must carry the devoir of persuasion to show either that (i) he has suffered past persecution on account of one of these five protected grounds (thus creating a rebuttable presumption that he may suffer future persecution), or (ii) it is more likely than not that he will be persecuted on account of a protected ground upon his return to his native land.[5]  See 8 C.F.R.

---

[4]The petitioner's wife and minor daughter appear as co-petitioners.  Since their claims are purely derivative, we do not dwell on them.  It suffices to say that our denial of the head of the household's claim, see text infra, necessitates the denial of their derivative claims as well.

[5]The threshold of eligibility for withholding of removal is higher than the threshold of eligibility for asylum.  Mekhoukh v. Ashcroft, 358 F.3d 118, 130 (1st Cir. 2004); Ipina v. INS, 868 F.2d

-6-

§ 208.16(b); see also INS v. Stevic, 467 U.S. 407, 429-30 (1984).
A showing of a well-founded fear of future persecution involves
both objective and subjective elements. See Laurent v. Ashcroft,
359 F.3d 59, 65 (1st Cir. 2004). To perfect that showing, an alien
must establish not only that he harbors a subjectively genuine fear
of future persecution but also that an objectively reasonable basis
for that fear exists. Id.

The Attorney General's authority to make these
determinations has been delegated to the BIA. See 8 C.F.R. §
1003.1(a)(1). We review the BIA's findings of fact, including its
credibility determinations, pursuant to the substantial evidence
standard. Mediouni v. INS, 314 F.3d 24, 26 (1st Cir. 2002). Under
that regime, a reviewing court will accept the BIA's findings as
long as they are "supported by reasonable, substantial, and
probative evidence on the record considered as a whole." INS v.
Elias-Zacarias, 502 U.S. 478, 481 (1992). This means, in effect,
that we will set aside the BIA's findings only if, and to the
extent that, "the record evidence would compel a reasonable
factfinder to make a contrary determination." Aguilar-Solis v.
INS, 168 F.3d 565, 569 (1st Cir. 1999). A recent amendment to the
INA has codified this deferential standard. See 8 U.S.C. §

_____

511, 515 (1st Cir. 1989). In this instance, the IJ ruled that the
petitioner's application for asylum was time-barred, and the
petitioner has not challenged that ruling. Thus, the petitioner
must satisfy the higher eligibility standard for withholding of
removal.

1252(b)(4)(B) (ordaining that the BIA's findings of fact shall be upheld "unless any reasonable adjudicator would be compelled to conclude to the contrary").

Rulings of law command our attention under a somewhat different framework.  We afford de novo review to the BIA's legal conclusions, but cede some deference to its interpretations of the INA.  See INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999); Lattab v. Ashcroft, 384 F.3d 8, 17 (1st Cir. 2004); see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).

In this case, the petitioner focuses on the fourth of the five protected grounds:  membership in a particular social group.  He variously defines that social group as comprising those who "refused to perform illegal tasks because of pressure" from workplace supervisors or "trapped" employees forced to acquiesce to the demands of corrupt employers.[6]  To make matters more nebulous, the IJ synthesized his argument as being that the particular social group consisted of "whistleblowers," and the petitioner has not

---

[6]We flatly reject the petitioner's belated suggestion that his social group consists of either public employees or business professionals.  No such argument was made to the BIA, and it is too late to make new arguments here.  See Makhoul v. Ashcroft, 376 F.3d 75, 80 (1st Cir. 2004); Ravindran v. INS, 976 F.2d 754, 761 (1st Cir. 1992).  In all events, by the petitioner's own account, the threats supposedly directed against him and his family emanated solely from his participation in the government investigation into alleged corruption and only peripherally involved his particular occupation and place of business.

-8-

disavowed that nomenclature. The petitioner urges that the BIA erred in concluding that he failed to prove a cognizable threat of future persecution on account of that membership, however defined. His argument is unpersuasive.

In determining what constitutes persecution on account of membership in a particular social group, the key is whether the claimed persecution is aimed at an individual because of his or her affiliation with a group of persons, all of whom share a common, immutable characteristic. See Gebremichael v. INS, 10 F.3d 28, 36 (1st Cir. 1993); Ananeh-Firempong v. INS, 766 F.2d 621, 626 (1st Cir. 1985); see also In re Acosta, 19 I. & N. Dec. 211, 233 (BIA 1985), overruled in part by In re Mogharrabi, 19 I. & N. Dec. 439 (BIA 1987). Because the most obvious groups meeting these criteria — such as racial or ethnic groups — are independently covered under the withholding of removal statute, stand-alone social group claims are rather rare. See Gebremichael, 10 F.3d at 35 n.20. When such claims are proffered, they usually are based on discrete classes such as gender, e.g., Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir. 1993), kinship units such as clans, e.g., In re H-, 21 I. & N. Dec. 337, 337 (BIA 1996), or individual family membership, e.g., Gebremichael, 10 F.3d at 36.

To be sure, the common characteristic also may reflect a shared experience, such as past membership in a military or paramilitary force. See, e.g., Mediouni, 314 F.3d at 28. Whether

the common characteristic is innate or experiential, "it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." Acosta, 19 I. & N. Dec. at 233.

At first blush, none of the labels used by the petitioner or the IJ seems to fit comfortably with the concept of a "recognizable and discrete" social group. Gebremichael, 10 F.3d at 36. One telltale is the difficulty that the petitioner has in delineating his particular social group; he defines it in various ways at various times, without much in the way of precise line-drawing. Yet, notwithstanding this imprecision, we are keenly aware that refugees' situations vary widely. Thus, we have been reluctant to exclude characteristics categorically from the "social group" definition. Cf. Elien v. Ashcroft, 364 F.3d 392, 396 (1st Cir. 2004) (cautioning that the term "particular social group," as used in the INA, is not "free from ambiguity"). The taxonomic problem is exacerbated here because whistleblowers generally have been recognized as political, rather than social, refugees, see, e.g., Reyes-Guerrero v. INS, 192 F.3d 1241, 1245 (9th Cir. 1999); Marquez v. INS, 105 F.3d 374, 381 (7th Cir. 1997), yet the petitioner explicitly relinquished this ground before the IJ and does not attempt to resurrect it here.

Even so, characteristics relating to current or former employment status can, at least theoretically, form the linchpin for assembling a protected social group. See, e.g., Meguenine v. INS, 139 F.3d 25, 27 n.2 (1st Cir. 1998) (stating that a health care worker who refuses to violate her profession's code of ethics might have a "trait which a member of that group should not, in good conscience, be required to change"); see also Alvarez-Flores v. INS, 909 F.2d 1, 7 (1st Cir. 1990) (finding "strained," but accepting arguendo, a petitioner's contention that he was a member of a social group of cheesemakers subject to persecution for having supplied food to guerilla groups). The petitioner here alternatively self-identifies as a "trapped" or harried governmental employee, and at least one court has been willing to recognize a social group of "former government employees who refused to comply with their employer's demands." Marku v. Ashcroft, 380 F.3d 982, 987 n.8 (6th Cir. 2004).

In the last analysis, we find it unnecessary to decide whether former employees or whistleblowers can comprise a cognizable social group. Assuming, for argument's sake, that the "social group" requirement has been met, the petitioner nonetheless has failed to show persecution based on his claimed membership in such a group: the evidence in this case does not compel a finding, more likely than not, that he was persecuted on account of his status as a member of that group. That defect is, in itself, fatal

to his claim for withholding of removal. See Aguilar-Solis, 168 F.3d at 570 (explaining that there must be a nexus between the alleged acts of persecution and the statutorily protected ground); see also 8 C.F.R. § 208.16(b). We explain briefly.

The BIA found that the petitioner did not forge the necessary connection between the claimed persecution and the claimed social group membership. The record amply supports this finding. The most obvious justification is the BIA's determination that the petitioner and Mauricio had became ensnared in what was "essentially a personal dispute." This determination represents a fair inference from the record and, therefore, is supported by substantial evidence. See 8 U.S.C. § 1252(b)(4)(B). That determination contradicts any claim that the petitioner was persecuted on account of his membership in any particular social group. See Romilus v. Ashcroft, 385 F.3d 1, 6 (1st Cir. 2004) ("The INA is not intended to protect aliens from violence based on personal animosity."); Aguilar-Solis, 168 F.3d at 572 (similar); see also Mogharrabi, 19 I. & N. Dec. at 447.

The finding of a lack of connection between the claimed persecution and the claimed social group membership is sustainable on another ground as well. In the prototypical case, a well-founded fear of persecution arises when an alien faces the prospect of severe mistreatment at the hands of his own government should he be returned to his native land. See Ananeh-Firempong, 766 F.2d at

-12-

622-23. Action by non-governmental actors can undergird a claim of persecution only if there is some showing that the alleged persecutors are in league with the government or are not controllable by the government. See Aguilar-Solis, 168 F.3d at 573; see also de la Llana-Castellon v. United States, 16 F.3d 1093, 1097 (9th Cir. 1994) (explaining that installation of a new Nicaraguan government did not necessarily quell petitioner's fears of persecution at the hands of the Sandinistas).

By like token, an alien who asserts a fear of future persecution by local functionaries ordinarily must show that those functionaries have more than a localized reach. The rationale behind this requirement is that if a potentially troublesome state of affairs is sufficiently localized, an alien can avoid persecution by the simple expedient of relocating within his own country instead of fleeing to foreign soil. See Lukwago v. Ashcroft, 329 F.3d 157, 181 (3d Cir. 2003); Singh v. Moschorak, 53 F.3d 1031, 1034 (9th Cir. 1995) (collecting cases); In re C-A-L-, 21 I. & N. Dec. 754, 757 (BIA 1997); see also 8 C.F.R. § 208.16(b)(2) (stating that an alien seeking withholding of removal cannot show that it is more likely than not that he will suffer future persecution if he "could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so").

Viewed in this light, the BIA had adequate justification, based on the record, for finding no cognizable persecution. The petitioner did not present a shred of evidence that Mauricio posed any danger beyond the municipal boundaries of Campos. Moreover, the fact that the petitioner's wife and daughter lived in Brazil without incident during the year that they spent at a relative's house outside the city limits speaks volumes about the localized nature of any such peril.

To cinch matters, the record contains no evidence that the federal government lacked either the will or the wherewithal to discipline Mauricio and those loyal to him. Indeed, the very fact that federal investigators shut down Mauricio's corrupt boondoggle undercuts the petitioner's wholly conclusory claim that his boss enjoyed special protection outside the local purlieus in which he operated. This lack of proof that the federal authorities would be unable or unwilling to do their duty, and thus safeguard the petitioner and his family, is telling. See Lopez-Soto v. Ashcroft, 383 F.3d 228, 234 n.9 (4th Cir. 2004) (noting that persecution requires either state action or a demonstrated inability of the state to protect victims from non-state actors); Aguilar-Solis, 168 F.3d at 573 (similar).

Let us be perfectly clear. If the state is the putative persecutor, internal relocation will almost always be a moot point. See Singh, 53 F.3d at 1034 ("it has never been thought that there

-14-

are safe places within a nation when it is the nation's government that has engaged in the acts . . . that have driven the victim to leave the country").  Even if the putative persecutor is a local official or other non-state actor, an alien need not show that he will be unsafe <u>anywhere</u> in the country in order to avoid automatic disqualification from withholding of removal.  Where, for example, the non-state actor's reach is countrywide, the inefficacy of internal relocation will be apparent.  <u>See</u> <u>Sepulveda</u> v. <u>U.S. Atty. Gen.</u>, 378 F.3d 1260, 1265 (11th Cir. 2004) (finding that IJ erred by holding that persecution could be avoided by relocating within Colombia, given uncontradicted evidence that "guerillas exercise influence throughout [the country]").  The touchstone is whether, under all the circumstances of a particular case, internal relocation is a reasonable solution.

In this instance, even if the petitioner had shown that he would be subject to persecution based on his alleged social group membership, the putative persecutor is an individual whose sphere of influence apparently encompasses only one municipality in a large country.  Moreover, there is no evidence that the government cannot or will not protect the petitioner should he return.  Here, then, relocation within the country is a feasible course of action.[7]  Given that reality, the BIA was not compelled

---

[7]The petitioner's claim that he made reasonable efforts to relocate within Brazil is unavailing.  He couches this claim in sweeping generalities and never explains why the funds that he

-15-

to find that the petitioner had a well-founded fear of future persecution.

## III.

## Conclusion

We need go no further. While we leave the "social group" question open, we nonetheless uphold both the BIA's determination that the petitioner failed to establish a well-founded fear of future persecution and its rejection of the petitioner's claim for withholding of removal.

**The petition for review is denied**.

---

borrowed to bring himself and his family to the United States could not have been expended to establish a new Brazilian domicile away from Campos.