# United States Court of Appeals
## For the First Circuit

---

No. 04-1252

STELLA OLUJOKE, A/K/A STELLA OLUJOKE FALAE,
A/K/A STELLA OLUJOKE AKINKUOWO,
A/K/A JOKE AKINKUOWO,
A/K/A ELIZABETH ABOLANLE ADEYEMI,

Petitioner,

v.

ALBERTO R. GONZÁLES,* ATTORNEY GENERAL,

Respondent.

---

PETITION FOR REVIEW OF AN ORDER

OF THE BOARD OF IMMIGRATION APPEALS

---

Before

Boudin, Chief Judge,
Torruella and Selya, Circuit Judges.

---

Ronald W. Thompson, Jr. on brief for petitioner.
Peter Keisler, Assistant Attorney General, Civil Division,
Terri J. Scadron, Assistant Director, and Jennifer Levings,
Attorney, Office of Immigration Litigation, on brief for
respondents.

---

June 9, 2005

---

_____

*Alberto R. Gonzáles was sworn in as United States Attorney General
on February 3, 2005. We have therefore substituted Attorney
General Gonzáles for his predecessor in office as respondent in
this matter. See Fed. R. App. P. 43(c)(2).

**SELYA**, <u>**Circuit Judge**</u>.  Petitioner Stella Olujoke Falae, a Nigerian national, seeks review of a final order of the Board of Immigration Appeals (BIA) denying her application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).  The petitioner argues that the BIA erred in summarily upholding an immigration judge's determination that she was not a credible witness and that, therefore, she had failed to establish eligibility for relief.  In the alternative, the petitioner argues that the BIA should have allowed her motion to remand based upon new evidence.  After careful review, we conclude that the decision below is supported by substantial evidence and that the BIA did not misuse its discretion in rejecting the motion to remand.  Consequently, we deny the petition for review.

## I.  BACKGROUND

On or about December 13, 1993, the petitioner was admitted as a nonimmigrant visitor to the United States through the use of a Nigerian passport and visa obtained under a false name. She was authorized to remain in the United States until January 12, 1994.  She overstayed that authorization and, in May of 1994, she filed an application for asylum in which she claimed, inter alia, that she had been persecuted in her homeland due to her decision to convert from Islam to Christianity.

The petitioner's fiancé, Michael Falae, followed her from Nigeria to the United States.  After having encountered some bumps

in the road — Michael wed, and then divorced, another woman — the couple married on July 19, 1997. For a time, immigration proceedings involving the petitioner and Michael Falae were consolidated. Eventually, however, the two went their separate ways and the immigration proceedings were uncoupled. We deal here exclusively with Stella Olujoke's petition. We resolved Falae's case in a companion opinion filed earlier today. See Falae v. Gonzáles, ___ F.3d ___ (1st Cir. 2005) [No. 04-1288].

On May 18, 1999, Stella and Michael were jointly interviewed by an asylum officer, who found them lacking in credibility and referred the matter of their status to the immigration court. When the Immigration and Naturalization Service (INS) instituted removal proceedings,[1] the petitioner conceded removability and cross-applied for asylum, withholding of removal, and protection under the CAT. A series of hearings before an immigration judge (IJ) followed. These hearings continued through June 18, 2002. We succinctly summarize the petitioner's testimony.

The petitioner stated that she was born in 1965 to a devout Muslim family. She grew up in Ondo Town, Nigeria, and practiced the Islamic religion until age fifteen. She was then

---

[1]The Homeland Security Act of 2002, Pub. L. 107-296, § 471, 116 Stat. 2135, 2205 (codified as amended at 6 U.S.C. § 291(a)), eliminated the INS and transferred its duties to the Department of Homeland Security. See Lattab v. Ashcroft, 384 F.3d 8, 13 n.2 (1st Cir. 2004). For simplicity's sake, we continue to refer to the INS throughout this opinion.

introduced to Christianity and began to participate in local church activities. She eventually decided to abandon Islam entirely and became a member of the Celestial Church of Christ. She fell in love with Michael Falae, a Christian, and planned to marry him.

The petitioner's parents did not accept the news graciously. They were outraged at the thought of their daughter marrying out of the faith. When she brought Falae home, family members "beat him up." She too endured her parents' wrath; her father punched her in the face, bloodying her nose.

At that point, her family began a pattern of abuse directed against her. This abuse ranged from the bizarre (locking her inside the local mosque) to the mundane (refusing to pay her tuition at the local college) to the physically dangerous (denying her food).

The abuse was not carried out only by family members. On one occasion, the petitioner was waiting for a bus. A passerby offered her a lift. Once she was inside the car, he brandished a knife and told her that he had been sent by her parents to kill her. Another incident occurred on December 25, 1992. While the petitioner was driving home from services with fellow churchgoers, eight Muslim men waylaid the car, dragged the occupants onto the street, doused the vehicle with gasoline, and set it on fire. They then chased the petitioner and stabbed her in the back with a broken bottle, causing severe injuries. A third incident occurred

on September 16, 1993; a Muslim man struck the petitioner on the head with "iron" as she was en route to a religious ceremony. The resulting injuries required "stitches all over" and hospitalization for seventeen days. She fled the country to escape from further violence.

The IJ was unmoved by this horrific tale. She found the petitioner wholly lacking in credibility, so much so that she concluded that the petitioner had never been a Muslim, that she had never been harassed, that she did not flee to escape abuse, and that she had no reason to fear persecution should she return to Nigeria. The IJ bolstered her conclusions with specific findings. We summarize the most pertinent findings below:

1. The petitioner had entered the country using a false passport and visa, yet offered no explanation as to why she could not have obtained genuine travel documents in her own name.

2. The petitioner presented a birth certificate at the hearings, which was reliably determined by forensic experts to be fraudulent.

3. There were numerous internal inconsistencies in the petitioner's testimony. For example, although the petitioner claimed to have been raised in a devout Muslim home and to have practiced the Islamic faith until she was fifteen years of age, she could not answer the most basic questions about that religion. Moreover, she could not read any Arabic, recite any Islamic prayers, name any part of the Koran, or identify any Muslim holiday (other than Ramadan).

4. The petitioner garbled the facts with respect to the history of her relationship with Michael Falae. For example, she testified that the two had met in 1990, yet she had stated in the asylum interview that they had met in either 1980 or 1985.

5. The petitioner presented conflicting accounts of the alleged incidents of persecution. In her written asylum application, she offered one version of her alleged encounter with the man sent by her parents, stating that he knocked her unconscious and took her to a nearby village. In her asylum interview, she neglected to mention any details regarding this incident. In her testimony before the IJ, she made no claim that she had been knocked unconscious, but said that the man brandished a knife and that she had lost control of her bowels and soiled herself (details glaringly absent from her prior presentations). She was similarly inconsistent with regard to the alleged attack of September 16, 1993. In her asylum application, she claimed that she had been beaten by a gang of Muslim youths and had been rescued by friends. In her testimony before the IJ, she related that a single individual had struck her with "iron" and that she had been admitted to the hospital for head trauma. This alleged hospital stay was not mentioned in the petitioner's asylum application and the petitioner did not produce the hospital records.[2]

6. The combined demeanor of the petitioner and Michael Falae (whom the petitioner had called as a witness) led the IJ to conclude that both her testimony and his was evasive and untruthful. The IJ noted, among other

_____

[2]She did offer a letter as "proof" that the hospitalization occurred, but the IJ had no way to authenticate the letter and rejected the proffer. The IJ noted that, in any event, the letter conflicted with the petitioner's testimony, since the letter related only that she was treated with injections and tablets, making no mention of stitches.

things, that Falae attempted several times to "coach" the petitioner and vice versa. Moreover, the two repeatedly looked to each other for answers as they testified.

The petitioner's case rested squarely on her own testimony. Because that testimony was not credible, the IJ concluded that she had not carried her burden of proving either past persecution or a well-founded fear of future persecution. Similarly, she had not proved that it was more likely than not that she would undergo torture if she were removed to Nigeria. Accordingly, the IJ denied the application for asylum, withholding of removal, and protection under the CAT.

The petitioner appealed this decision to the BIA. While her appeal was pending, she moved to remand the case to the IJ based upon new evidence: a psychological evaluation purporting to explain the petitioner's evasive demeanor and inconsistent testimony during the hearings. On January 29, 2004, the BIA summarily affirmed the IJ's decision and denied the motion to remand. As to the latter, the BIA found that the report was not "new evidence" inasmuch as the underlying information on which it rested was available at the time of the hearings and could have been proffered to the IJ. As an alternate ground, the BIA found the report immaterial, as the IJ's adverse credibility finding was not based upon demeanor alone. This timely petition for review followed.

## II.  DISCUSSION

We treat sequentially the petitioner's claims that the BIA erred (i) in summarily affirming the denial of her asylum, withholding of removal, and CAT claims, and (ii) in refusing to reopen the proceedings below.

### A.  The Asylum Claim.

We turn first to the asylum claim.  In order to establish an entitlement to asylum, an alien bears the burden of showing that she is a refugee within the meaning of the immigration laws.  See Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 124 (1st Cir. 2005); see also 8 U.S.C. § 1158(b)(1); 8 C.F.R. § 208.13(a).  A refugee is a person who cannot or will not return to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A); see also Rodriguez-Ramirez, 398 F.3d at 124.

We review findings of fact in immigration cases, including credibility determinations, under the substantial evidence standard.  Da Silva v. Ashcroft, 394 F.3d 1, 4 (1st Cir. 2005).  Where, as here, the BIA summarily affirms an IJ's asylum determination, we review directly the IJ's decision as if it were the decision of the BIA.  Jupiter v. Ashcroft, 396 F.3d 487, 490 (1st Cir. 2005).  We review agency determinations of fact, including credibility assessments, under a highly deferential

-8-

standard. We must affirm the findings upon which the decision rests if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). Stated another way, the findings must stand unless the record evidence is such as to compel a reasonable factfinder to make a contrary determination. See Da Silva, 394 F.3d at 4-5; see also 8 U.S.C. § 1252(b)(4)(B).

The petitioner's claim for asylum revolves around her asseveration that she was persecuted on the basis of her religious affiliation.[3] The IJ found her testimony to be incredible and supported this finding with several subsidiary findings. These included book-and-verse references to significant inconsistencies in the petitioner's testimony, her persistent resort to fraudulent documentation, and her demeanor during the hearings. We have explained before — and today reaffirm — that when "the judicial officer who saw and heard [a] witness makes an adverse credibility determination and supports that determination with specific findings, an appellate court should treat that determination with

---

[3]We note in passing that the petitioner's account, even if credited, likely would have been legally insufficient. In order to ground an asylum application, persecution ordinarily must be practiced or at least condoned by the government. See Da Silva, 394 F.3d at 7; Ananeh-Firempong v. INS, 766 F.2d 621, 622-23 (1st Cir. 1985). The record in this case does not make that connection.

-9-

great respect." Laurent v. Ashcroft, 359 F.3d 59, 64 (1st Cir. 2004). This is such a case.[4]

That effectively ends this aspect of the matter. When a petitioner's case depends on the veracity of her own testimony, a fully supported adverse credibility determination, without more, can sustain a denial of asylum. See Forgue v. U.S. Atty. Gen., 401 F.3d 1282, 1287 (11th Cir. 2005); see also Dia v. Ashcroft, 353 F.3d 228, 247 (3d Cir. 2003) (en banc) ("An alien's credibility, by itself, may satisfy his burden, or doom his claim.").

Here, the IJ's specific findings strongly corroborate her global finding that the petitioner's testimony lacked credibility. These included the petitioner's use of false documentation to enter the country and her presentation of a bogus birth certificate to the court. This type of fraudulent behavior, if not satisfactorily explained,[5] may reflect directly and adversely on a petitioner's

---

[4]Section 101(a)(3) of Title I of the REAL ID Act of 2005, Pub. L. No. 109-13, § 101(a)(3), 119 Stat. 231, 303 (2005) (to be codified at 8 U.S.C. § 1158(b)(1)(B)), contains new standards referable to credibility determinations in cases involving "applications for asylum, withholding, or other relief from removal." Id. § 101(h)(2), 119 Stat. at 305. These standards are only applicable, however, to applications "made on or after" May 11, 2005 (the date of enactment). See id. Since the petitioner's application was made long prior to that date, the new standards have no bearing here.

[5]As the IJ noted, "there may be a reason, fully consistent with the claim of asylum, that will cause a person to possess false documents, such as the creation and use of a false document to escape persecution by facilitating travel." Here, however, the petitioner put forth no evidence indicating that she had attempted to apply for an authentic passport, that one had been denied, or

overall credibility.  See United States v. Williams, 986 F.2d 86, 89 (4th Cir. 1993); In re O-D-, 21 I. & N. Dec. 1079, 1083 (BIA 1998).  So too the inconsistencies in the petitioner's testimony, which went to the fundamental elements of her persecution claim. These inconsistencies, in and of themselves, offered a solid foundation for the IJ's determination.  See Toure v. Ashcroft, 400 F.3d 44, 47-48 (1st Cir. 2005); Bojorques-Villanueva v. INS, 194 F.3d 14, 17 (1st Cir. 1999).

To say more on this subject would be to paint the lily. We hold, without serious question, that the IJ's decision that the petitioner failed to show either past persecution or a well-founded fear of future persecution is supported by substantial evidence.

**B.   The Withholding of Removal and CAT Claims.**

The petitioner's remaining two substantive claims can be swiftly dispatched.  A claim for withholding of removal "places a more stringent burden of proof on an alien than does a counterpart claim for asylum."  Rodriguez-Ramirez, 398 F.3d at 123 (citing Makhoul v. Ashcroft, 387 F.3d 75, 82 (1st Cir. 2004)). Consequently, the denial of the petitioner's asylum claim perforce serves to defeat her counterpart claim for withholding of removal.

The petitioner's attempt to obtain judicial review of the denial of her claim for protection under the CAT is equally

_____

that she feared that her persecutors would attempt to stop her if she traveled under her own name.

unavailing.   The petitioner failed to make any developed argumentation in support of that claim before the BIA.   Thus, the doctrine of exhaustion of administrative remedies bans any attempt on her part to resurrect the issue here.   See Makhoul, 387 F.3d at 80 (holding that the court of appeals is without jurisdiction to consider points not squarely raised before the BIA); Alvarez-Flores v. INS, 909 F.2d 1, 8 (1st Cir. 1990) (same).

### C.   **The Motion to Remand**.

This leaves the BIA's denial of the motion to remand. The petitioner requested that relief based on the contents of a psychological report proffered to explain the inconsistencies in her testimony and her demeanor while testifying.   The report, authored by Dr. Ronald A. Cohen (a neuropsychologist), limned the results of a series of cognitive tests administered on May 13, 2003.   Dr. Cohen's diagnosis was that the petitioner suffered from impaired memory and diminished cognitive ability.   He noted, however, that it was at least possible that the petitioner had exaggerated her symptoms during the testing.

The BIA appropriately treated this motion as a motion to reopen.   See Falae, ___ F.3d at ___ [slip op. at 7] (citing In re Coelho, 20 I. & N. Dec. 464, 471 (BIA 1992)).   Given concerns about finality and expeditious processing, motions to reopen are generally disfavored.   INS v. Abudu, 485 U.S. 94, 107 (1988); Fesseha v. Ashcroft, 333 F.3d 13, 20 (1st Cir. 2003).   Broadly

-12-

stated, the movant must make a showing of a "prima facie case for the underlying substantive relief sought" and must identify "previously unavailable, material evidence." Mabikas v. INS, 358 F.3d 145, 148 (1st Cir. 2004) (citation and internal quotation marks omitted); see 8 C.F.R. § 1003.2(c)(1). Even then, the movant must persuade the BIA to exercise its discretion affirmatively. Jupiter, 396 F.3d at 490; Mabikas, 358 F.3d at 148. In the last analysis, then, the granting or denial of such a motion is discretionary on the part of the BIA. See INS v. Doherty, 502 U.S. 314, 323 (1992).

Viewed against this background, we decline to disturb the BIA's ruling for three reasons. First, the BIA's determination that the information underlying the report was not previously unavailable is well-supported. The report recounts that the petitioner's alleged symptomotology began to manifest itself long in advance of the hearings. The testing could have been performed during the several years that elapsed between the docketing of the petitioner's case and the hearings at which she testified. The fact that the petitioner did not deem those symptoms important enough either to present them to the IJ or to secure a professional evaluation of them in a timely manner does not make the information about the symptoms "previously unavailable." See, e.g., Gebremaria v. Ashcroft, 378 F.3d 734, 739 (8th Cir. 2004).

This ground is dispositive, so we allude to the other two reasons in shorthand form. The second reason why the BIA's ruling is sustainable relates to the inconclusive nature of the report, which left open the possibility that the petitioner was exaggerating her symptoms during the testing. The final reason is that the IJ's adverse credibility determination rested on much more than the petitioner's testimonial demeanor (and, therefore, the proffer was not material).

## III.  CONCLUSION

We need go no further. For the reasons elucidated above, we conclude that the BIA's denial of merits relief is supported by substantial evidence in the record and that the BIA acted well within the realm of its discretion in rejecting the petitioner's motion to remand.

**<u>The petition for review is denied</u>**.