# United States Court of Appeals
## For the First Circuit

No. 05-2209

LUSH LUMAJ,

Petitioner,

v.

ALBERTO GONZALES, UNITED STATES ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW FROM THE BOARD OF IMMIGRATION APPEALS

Before

Howard, <u>Circuit Judge</u>,
Coffin and Campbell, <u>Senior Circuit Judges</u>.

<u>Charles Christophe</u> on brief for petitioner.
<u>Peter Keisler</u>, Assistant Attorney General, Civil Division,
<u>Terri J. Scadron</u>, Assistant Director, and <u>Claudia B. Gangi</u>, Trial
Attorney, on brief for respondent.

April 26, 2006

**COFFIN, Senior Circuit Judge.**  Petitioner Lush Lumaj claims that he fled his native Albania in 2001 because of persecution based on his involvement with the Democratic Party.  He entered the United States using a false passport and subsequently applied for asylum and withholding of removal.  In denying his application, the Immigration Judge (IJ) found that petitioner was not a credible witness and that he had failed to establish eligibility for relief.  The Bureau of Immigration Appeals (BIA) affirmed without opinion.  After examining the record, we conclude that the IJ's decision is sufficiently supported and consequently deny Lumaj's petition for review.  See 8 U.S.C. § 1252(b)(4)(B).[1]

## I. Factual Background

Petitioner arrived in the United States in May 2001 and presented a Slovenian passport bearing someone else's name.  He was detained at Miami International Airport, and an asylum officer who interviewed him concluded that his assertions of persecution might be found credible if fully developed.  Petitioner subsequently submitted an Application for Asylum and for Withholding of Removal.

In his accompanying two-page statement, he reported that his family had been persecuted through the years by the communist regime in Albania and that they had been among the first to support

---

[1] Section 242(b)(4)(B) of the INA, 8 U.S.C. § 1252(b)(4)(B), provides that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."

the democratic movement that emerged in the early 1990s. He stated that he joined the Democratic Party (DP) in 1991 and became active in the organization's Youth Forum, encouraging friends to join the party and working as an election coordinator for DP candidates. The party won the elections in 1992 and remained in power until 1997, when the Socialist Party – which petitioner links with the Communist Party – regained control of the Albanian government.

Petitioner claims that he was actively involved with the Youth Forum during the June 1997 elections and that his activities, which included transporting people to the polls and to demonstrations, were watched "by the local fanatics and the Socialist police." He stated that on June 29, "two well-known criminals" came to his car window and said: "Keep it up and you'll end up dead." Another incident occurred two years later, in July 1999, when petitioner reports he was arrested at his home for participating in an illegal rally and distributing anti-government leaflets. He claimed that he was held in custody overnight, beaten with a rubber stick, and told upon his release to stop supporting the DP "or you will have problems with us."

He remained active, however, and reported that he barely escaped when the police came to his home to arrest him in November 2000. After hiding for a month, he resumed his political activities and took part in several demonstrations. In January 2001, a friend dissuaded him from joining a hunger strike that was

part of a large protest because petitioner was known as one of "the most wanted democrats" and would be "attacked by the large contingent of policemen."

Petitioner wrote that, at that time, "[r]ealizing that my life was in danger," he made the "very difficult decision to leave my family and escape Albania before I would get killed." The statement then describes his route to the United States in April and May 2001, which began with three days in Greece and continued with stops in Spain, France and Guadeloupe before he reached Miami.

Petitioner presented oral testimony on three separate occasions and before two immigration judges because of continuances in his hearing. He provided further details of his family's political persecution, including that his father's uncle's son had been executed and his own cousin had been imprisoned for sixteen years. He asserted that his family's properties had been confiscated and that he had been allowed to remain in school only through eighth grade. Petitioner also testified, however, that his father had served as chief in their village and that neither parent had experienced difficulties stemming from their recent DP involvement.[2]

In his testimony on April 28, 2003, he reported that his arrest in July 1999 occurred after police forcibly entered his home

---

[2] He reported that his mother had been interned from 1948 to 1952 by the Communist regime.

-4-

at 11 p.m., and he stated that he was punched and beaten with police clubs during the four- to five-hour drive to the police station. At the resumed hearing on February 19, 2004, however, petitioner recalled the episode differently. He stated that the police knocked on the door when they arrived, and his mother opened it. He then testified that he was taken to the police station, where he was beaten with a rubber stick. On both occasions, he said that he was told upon his release that he would be killed if he continued to support the DP leader Berisha.

Petitioner also testified to additional details of the episode that occurred in November 2000, when he fled his home to avoid the police. In his testimony on June 26, 2003, he stated that he went to a friend's home in the mountains but returned several hours later to a location "close to home" to meet with his father, who told him that the police had indeed been looking for him. Again, the February 2004 hearing revealed a changed version of the events. At that time, petitioner stated that he remained in hiding with his friend for a week or more, that his friend acted as a messenger between him and his parents, and that it was the friend who relayed the information that the police had come to arrest him.

Several other discrepancies in his story surfaced. At different times, he stated that he was born in different years (1972 and 1973), and he claimed at one point that he was issued only one DP membership card – in 1991 – but he submitted a copy of

a card issued in 2000. Earlier, he had testified that he had received other cards but lost them.

In addition to his own testimony, petitioner presented a witness, Rush Draju, another member of the DP who fled Albania and was awarded political asylum in the United States. Draju testified that petitioner was a member of the DP and had helped in his election campaign and in other candidates' campaigns. Petitioner also relied on country condition reports prepared by Amnesty International describing the ill treatment of DP supporters during the time period in which he claimed to experience persecution.

The IJ was unpersuaded by petitioner's presentation. Noting the inconsistencies in his recollections about significant events, the judge found petitioner not credible: "[H]e is testifying to very specific salient factors that a person who is telling the truth would not confuse." The judge found petitioner's demeanor to be "evasive" and "furtive," and he questioned his failure to seek asylum in any of the other countries through which he traveled en route to the United States. The judge noted that other members of petitioner's politically active family remain, unharmed, in Albania, and they own the land on which they farm. The IJ further relied, inter alia, on a report issued by the State Department detailing the educational opportunity available for members of the

Association of Former Politically Persecuted Persons.[3]  The judge also referred to petitioner's testimony on cross-examination that he had completed three months of military service in 1997, but did not resign and had no documents showing release from service.

As noted above, the IJ's denial of petitioner's application was affirmed without opinion by the BIA; we therefore review the IJ's decision.  See Susanto v. Gonzales, 439 F.3d 57, 59 (1st Cir. 2006); Olujoke v. Gonzales, 411 F.3d 16, 21 (1st Cir. 2005).  In evaluating a denial of asylum, our inquiry is limited to determining whether substantial evidence in the administrative record supports the IJ's findings that petitioner neither suffered from cognizable past persecution nor demonstrated a well-founded fear of future persecution.  Susanto, 439 F.3d at 59; Silva v. Ashcroft, 394 F.3d 1, 4 (1st Cir. 2004).[4]  Those findings "must

[3] Petitioner submitted a document indicating that he was a member of the Association, which supposedly entitled him to various benefits.  The State Department's Profile of Asylum Claims and Country Conditions in Albania reported that "[t]he only benefit delivered to date allows those registered to receive automatic admittance to Albanian universities while the general population must take highly competitive entrance exams."

[4] An alien seeking asylum must establish that he is a "refugee" within the meaning of the Immigration and Nationality Act (INA).  See 8 U.S.C. § 1158(b)(1); Bocova v. Gonzales, 412 F.3d 257, 262 (1st Cir. 2005).  To do so, an applicant must prove either a well-founded fear of persecution based on race, religion, nationality, political opinion, or membership in a social group, or past persecution based on one of these five grounds (which establishes a rebuttable presumption of a well-founded fear of future persecution).  See 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(b); Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir. 2005).

stand unless the record evidence is such as to compel a reasonable factfinder to make a contrary determination." Olujoke, 411 F.3d at 21. "Matters of witness credibility and demeanor are peculiarly for the factfinder," and credibility determinations supported with specific findings are treated with "'great respect.'" Rodriguez Del Carmen v. Gonzales, 441 F.3d 41, 43 (1st Cir. 2006) (quoting Laurent v. Ashcroft, 359 F.3d 59, 64 (1st Cir. 2004)).

Because we find the asylum ruling adequately supported, we do not address petitioner's alternative request for withholding of removal, which "'places a more stringent burden of proof on an alien,'" and thus cannot succeed when an asylum claim fails, Bocova v. Gonzales, 412 F.3d 257, 262 (1st Cir. 2005) (quoting Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 123 (1st Cir. 2005)); see also Olujoke, 411 F.3d at 22.

## II. Discussion

The IJ's decision rested on his determination that petitioner was not credible, based on observations and a number of significant inconsistencies that cast doubt on his allegations of abusive treatment and prompted the judge to question even his identity. In his oral decision, the judge said that he found it "extremely troubling" that petitioner testified twice that he was born in 1972 while his birth certificate showed a date of birth in 1973.[5] As

---

[5] In our review of the record, we could find only one instance of petitioner stating that he was born in 1972 rather than 1973.

-8-

previously noted, the IJ also was particularly bothered by the inconsistent details surrounding petitioner's detention in July 1999 and his escape from arrest in November 2000, viewing the differences as significant evidence of fabrication. The IJ also linked his credibility judgment to the other discrepancies noted above – including the date petitioner received the DP membership card and his alleged lack of access to higher education – as well as to petitioner's demeanor.

We conclude that the IJ's listed reasons for questioning petitioner's veracity are sufficient to meet the substantial evidence standard. Petitioner argues in his brief that the variations in his recollections are minor and tangential, but we think it reasonable for the judge to draw an inference of fictionalization from the differences in petitioner's portrayals of the two primary episodes of asserted persecution. Indeed, we, too, think it unlikely that petitioner could mis-remember whether the police officers who arrested him in 1999 burst through the door or gained entry by knocking.[6] Similarly, the variation in the time

---

[6] Of some significance, too, is the fact that petitioner did not mention the 1999 incident during his "credible fear" interview in 2001. The interview worksheet and the interviewer's notes indicate that, when asked if he or anyone in his family had been "mistreated or threatened by anyone in any country to which you may be returned," he responded that he had had no past encounters but feared that he would be a target in the future. Although this fact was not noted in the IJ's oral decision, it was the subject of inquiry by the previous IJ during proceedings in June 2003. Petitioner acknowledged that he had not reported the arrest and

petitioner reported spending away from home after his near-arrest in 2000 – a week vs. a month – need not be discounted as simply imperfect memory.

Other discrepancies, while perhaps minor in isolation, add to a reasonable inference of lack of candor. The different reported birth dates cast some doubt on the authenticity of his submitted birth certificate, and the DP card dated 2000, together with his testimony that he had received such a membership card only once, cast doubt on the veracity of his testimony that he joined the DP party in 1991. Although we can imagine that misunderstandings could result from imperfect translations of testimony, petitioner does not attribute any of the variations to language barriers. The IJ also reasonably could view the State Department's report that politically persecuted individuals have had access to higher education since 1992 to indicate that petitioner was disingenuously relying on lack of educational opportunity to bolster his persecution claim.[7]

Our discussion thus far applies in some measure to both the showing of past persecution and to the fear of future persecution.

_____

beating, stating, through an interpreter, that "I was very tired from the trip and I wasn't able to explain my whole story, from my activities, what I did in Albania and what happened to me."

[7] Petitioner also complains that the IJ's depiction of his demeanor as "evasive" and "furtive" was "conclusory and unsubstantiated." Even disregarding the demeanor appraisal would not, however, undermine the IJ's credibility finding, as it played a minimal role in his analysis.

-10-

Of particular relevance to the latter is the additional fact that petitioner's parents and sister remain in Albania, apparently without imminent risk of harm, despite the family's longstanding history of political persecution and his father's public status as an elected DP official. Although petitioner points to his parents' advanced age to explain their apparently peaceful existence, we have no basis for treating age as a relevant distinction. As to his subjective fear of confronting persecution if he were sent back to Albania, the IJ pointed to petitioner's decision to return home for a number of months after the police came to his house in November 2000. The judge observed that it would be "incredible" that petitioner would return there "[i]f he truly had a fear of the government." Moreover, at this point, years removed from his involvement in DP politics, there is no probative evidence that petitioner is likely to be harmed if he returns. Thus, even if he could show a genuine subjective fear of future persecution, he has not met his separate obligation to establish an objectively reasonable basis for that fear. See Nikijuluw, 427 F.3d at 121-22; Bocova, 412 F.3d at 264.

In sum, our assessment of the record persuades us that the IJ's credibility judgment was grounded on an adequate foundation and that, as a consequence, the judge supportably concluded that petitioner failed to establish either past persecution or a well-founded fear of future persecution. Although that outcome renders

-11-

any further discussion unnecessary, see Olujoke, 411 F.3d at 22 ("a fully supported adverse credibility determination, without more, can sustain a denial of asylum"), we wish to note briefly that, even if we fully accepted the veracity of petitioner's claims of abuse, we doubt that he would have established persecution within the meaning of the INA.  He describes sporadic episodes, only one of which involved physical harm, and his mistreatment was less severe than in cases in which we have upheld the BIA's rejection of persecution claims.  See, e.g., Topalli v. Gonzales, 417 F.3d 128, 132 (1st Cir. 2005) (citing cases) (rejecting claim where petitioner was arrested, detained for up to 24 hours, and beaten on seven occasions); Bocova, 412 F.3d at 263-64 (citing cases) (rejecting claim where petitioner was beaten twice and once rendered unconscious: "mistreatment ordinarily must entail more than sporadic abuse in order to constitute persecution").

Accordingly, the petition for review is denied.