**[Not for Publication in West's Federal Reporter --
Citation Limited Pursuant to lst Cir. Loc. R. 32.3]**

# United States Court of Appeals
## For the First Circuit

---

No. 05-2106

ENGJELL CERIBASHI,

Petitioner,

v.

ALBERTO GONZALES,
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

---

ON PETITION FOR REVIEW FROM A DECISION
OF THE BOARD OF IMMIGRATION APPEALS

---

Before

Boudin, <u>Chief Judge</u>,
Coffin, <u>Senior Circuit Judge</u>,
and Selya, <u>Circuit Judge</u>.

---

    James D. Christo and Christo & Associates, P.C., on brief for
petitioner.
    Gina Walcott-Torres, Assistant U.S. Attorney, and Michael J.
Sullivan, United States Attorney, on brief for respondent.

---

July 21, 2006

---

**COFFIN, <u>Senior Circuit Judge</u>**.  Petitioner Engjell Ceribashi, a native and citizen of Albania, entered the United States in June 2001 on a six-month visitor's visa and applied early the next year for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT").  Finding that petitioner's tale of persecution lacked credibility, an immigration judge ("IJ") deemed him ineligible for relief; the Board of Immigration Appeals ("BIA") affirmed without opinion.  After carefully examining the record, we are unpersuaded that "any reasonable adjudicator would be compelled to" reach a different outcome, 8 U.S.C. § 1252(b)(4)(B), and we consequently deny Ceribashi's petition for review.

Ceribashi's allegations of persecution prominently feature his father's role as a political activist in Albania in the 1940s and the father's execution by the Communist regime in 1946, when petitioner was ten years old.  He claims that the family experienced various forms of ill treatment through the following decades, including his confinement in labor camps between 1965 and 1985.  Petitioner's circumstances improved when the Democratic Party ("DP") controlled the Albanian government in the 1990s and he was involved in DP activities,[1] but the danger returned when the Socialist Party came to power in 1997.

---

[1]  He claims that he participated in DP protests, demonstrations and meetings, that he was a speaker for the party, and that he served in the DP administration as an "inspector."

-2-

Ceribashi points to two specific incidents, in addition to his family history, to substantiate his claim of persecution. First, he asserts that in May 1998 he was deliberately hit by a car as he rode a bicycle to his home in Tirana. He was hospitalized for five days and, concerned about his safety, spent most of his time at home for the next two years. He returned to the hospital in March 2000 for surgery on his leg, and he said the second incident occurred upon his release about two weeks later. Two men confronted him after he left the hospital, warning that "[w]e are not done with you and your family" and threatening to cut off his legs or kill him if he continued his support for the Democratic Party. Petitioner said he recognized the men as active supporters of the Socialist Party.

Petitioner stated that his reports of the incidents to the police were ignored because the police also were Socialist supporters who recognized him and knew of his family background and DP affiliation. Fearing for his life after the second assault, petitioner went into hiding for six months and then applied for a visa at the American embassy. He was granted a visitor's visa in December 2000, but did not leave Albania until June 2001 because he lacked the funds to make the trip earlier.

Petitioner claims that if he is forced to return to Albania his life will be at risk because of his family history and his support for, and activities on behalf of, the Democratic Party.

The IJ, however, had "serious issues with [petitioner's] credibility," concluding that it is "highly unlike[ly] that [he] would have been targeted in the year 1998 or even in the year 2000 by those who perhaps might have remembered his father some 53 to 55 years ago."  The IJ further noted that, even if petitioner's version of events were credible, "he has failed to state a claim that is rational[] and reasonable based upon the country conditions in Albania as reported by the United States State Department." Accordingly, the IJ denied all of petitioner's claims.

Our review is limited: we consider only whether substantial evidence in the record supports the IJ's finding that the petitioner failed to show a well founded fear of persecution and thus did not establish his asylum claim; if the finding has sufficient support, it must stand unless a reasonable factfinder would be compelled to make a contrary determination.  Lumaj v. Gonzales, 446 F.3d 194, 198 (1st Cir. 2006) (citing Olujoke v. Gonzales, 411 F.3d 16, 21 (1st Cir. 2005)).[2]  The record here is adequate to sustain the IJ's ruling.[3]

---

[2] We review the IJ's decision, as the BIA affirmed without opinion.  Lumaj v. Gonzales, 446 F.3d 194, 198 (1st Cir. 2006).

[3] If the IJ's asylum ruling is supported, petitioner's alternative request for withholding of removal necessarily will fail. Bocova v. Gonzales, 412 F.3d 257, 262 (1st Cir. 2005).  The CAT claim has been forfeited, as it was not referenced in petitioner's appeal to the BIA. See Un v. Gonzales, 415 F.3d 205, 210-11 (1st Cir. 2005).

The IJ's doubts about petitioner's credibility stem in part from variations in his story about the bicycle incident and from the judge's skepticism that animosity toward petitioner's father sixty years ago would continue to fuel persecution against petitioner. The IJ noted that petitioner told the asylum officer who initially interviewed him that a car door opened suddenly and knocked him off his bicycle, but later testified that a car drove straight at him.[4] Of more significance in supporting the IJ's credibility judgment is that petitioner consistently reported that no one else was on the street when the bicycle incident occurred, but he produced a photograph of the suspect car taken by a friend nearly two years later; the friend supposedly "was close to the street where the incident happened," remembered the license plate number, and recognized the vehicle.

The IJ also observed that petitioner's son remains in Albania, apparently safely, and the record reveals that two of petitioner's siblings live there as well. Although petitioner claims that he is

---

[4] Petitioner suggests that the content of the asylum officer's report may not be considered because the officer was not subject to cross-examination. Petitioner, however, was given a chance to respond to the report at his hearing. Asked about the discrepancy, he stated that he could not remember the specifics of his comments to the asylum officer "because a long time passed since that day that I was interviewing but I know that what I said today is true that I was riding the bicycle and the car came toward me and the reason was to kill me." The IJ admitted the report into evidence as a hearsay document, noting that "I understand that you can't cross-examine on it." Given this context, it does not appear that the report was given undue weight in the IJ's ruling.

a target while they are not because of his DP activity and because his brother and sister are elderly, petitioner was beyond 65 when he left Albania and is now nearly seventy years old.

Moreover, the IJ was skeptical that petitioner played a significant role in the DP, and the record permits such doubts. In his application for asylum, petitioner said that he supported the democratic movement and "took part in . . . all the demonstrations to overthrow the communist system" and also stated that he wrote articles in the Democratic Party newspaper. He testified that he attended "all the meetings of the democratic party" and that he was "a speaker for the democratic system in that time." So far as we can tell, however, none of the newspaper articles he authored are in the record, and his DP membership card was dated July 2001 – which was after his arrival in the United States.[5] He offered no other specific evidence of a leadership role in the DP, and thus left largely unexplained why he would be targeted for harm – other than to rely on his father's activity half a century earlier.[6]

---

[5] The IJ noted that petitioner had said he came to the United States with his certificate of DP membership but that the certificate was dated a month after his arrival; whether he actually traveled with it is of little significance, but its date does permit an inference that petitioner was not a longtime DP activist and that he joined to bolster his asylum claim.

[6] Petitioner complains that the IJ failed to give weight to the years of persecution his family experienced as a result of his father's political activity. We think it evident that the judge considered that evidence, but deemed it largely irrelevant to the issue of petitioner's current risk of persecution.

Additionally, the IJ could have discounted the seriousness of any threat because petitioner remained in his home without incident for two years after the bicycle episode and then waited a year after the hospital episode to leave the country. Although he reported that he was in hiding for that final year, he also testified, in response to a question, that he lived in the same residence between 1998 and 2001, the year of his departure.

The IJ also pointed to other weaknesses he perceived in petitioner's story: he said it was implausible that Socialist Party gang members would be driving late-model Mercedes vehicles, as petitioner had alleged; he doubted that local police officials would recognize petitioner as the son of a political activist whose involvement had been a half-century earlier, or that such identity would "make any difference to them"; and he thought the possibility that a U.S. embassy official would issue a visitor's visa to an individual who said he wanted to apply for political asylum was "so highly unlikely as to be on the verge of being preposterous."

While these latter observations must be characterized as speculation rather than fact-finding based on record evidence, the ultimate inferences drawn by the IJ were not unreasonable given the sum total of petitioner's presentation. The generalities, inconsistency and gaps in his narrative diminished its persuasiveness, and the U.S. Department of State's Profile of Asylum Claims and Country Conditions for Albania, on which the IJ

relied, gave weight to the judge's view that petitioner's account was, in various respects, implausible. The IJ noted that the report, dated May 2001, stated that "[t]here is virtually no evidence that individuals are targeted for mistreatment on political grounds," observing that "[f]ar more prevalent is organized and amateur crime," exacerbated by, <u>inter alia</u>, police corruption, widespread availability of firearms, "and a culture of blood feud that is wholly independent of political activity."[7]

Petitioner complains that the IJ ignored record evidence of politically motivated violence, but the serious incidents described in the documents submitted on his behalf occurred in 2001 or earlier, and the most recent report in the record – the State Department's Country Report on Human Rights Practices in 2002 (dated March 2003) – noted that there were no confirmed cases of political killings by the government or its agents, no reports of politically motivated disappearances, and "no confirmed cases of detainees being held strictly for political reasons." From these reports, the IJ reasonably could have concluded that conditions in Albania with respect to politically motivated violence had improved since petitioner's departure.

---

[7] In <u>Waweru</u> v. <u>Gonzales</u>, 437 F.3d 199, 202 n.1 (1st Cir. 2006), we noted that "[t]he Board of Immigration Appeals is entitled to rely on the State Department's country reports as proof of country conditions described therein, although it must also consider evidence in the record that contradicts the State Department's descriptions and conclusions."

To be sure, the record materials make it clear that human rights abuses by the police and other institutions continued to occur; that evidence does not lead inevitably, however, to a conclusion that petitioner would be at risk on account of his political affiliation if he returned to Albania. Indeed, Amnesty International's report noted that similar brutality existed under the DP regime as well. Also relevant to the IJ's assessment of petitioner's claim is that the two most recent episodes of politically motivated violence reported – the death of a DP "leader" in police custody in 2001 and the killing of a DP "activist" in 2000 – affected DP members who appeared to have significantly more involvement than petitioner. In addition, the 2002 Country Report on Human Rights Practices stated that the Albanian government completed its investigation into a 1998 murder of a DP leader, with four suspects convicted and sentenced to prison terms between 2 1/2 years to life, allowing the IJ to infer that violence against DP supporters was not – or at least not always – condoned by the government.

Also of note, from a different perspective, are a 2002 World Report from Human Rights Watch and a 2001 report from Amnesty International, which stated that the head of the DP's Tropoja branch was arrested at his home in January 2001, allegedly for his role in a November 2000 attack on a police station, and later was brutally assaulted. The IJ reasonably could have concluded that,

if petitioner were truly a political target, he, too, would have been pursued at home.

The country condition material thus did not compel the conclusion that petitioner would be at risk based on his and his father's support of the Democratic Party if he were to return to Albania.   Given petitioner's age, the apparent decline in politically motivated incidents, and the not unreasonable inference of partial fabrication drawn by the IJ from petitioner's hearing testimony and other statements, his ruling was supportable.   On this record, even if we credited petitioner's accounts of the two assaults, we would lack the authority to override the IJ's finding that petitioner lacked a well-founded fear of <u>future</u> persecution. See <u>Lumaj</u>, 446 F.3d at 198 n.4. (government may rebut presumption regarding future persecution that arises from past persecution)[8]; <u>see</u> <u>also</u> <u>Makhoul</u> v. <u>Ashcroft</u>, 387 F.3d 75, 79 (1st Cir. 2004) ("[A] reviewing court can reverse the BIA only if the record unequivocally indicates error.").[9]

---

[8] If an asylum applicant can establish past persecution, he is presumed to be a refugee for purposes of eligibility for asylum. <u>Makhoul</u> v. <u>Ashcroft</u>, 387 F.3d 75, 80 n.3 (1st Cir. 2004).   "This presumption shifts the burden to the government to show that conditions in the applicant's home country have changed to such an extent that he has no well-founded fear of future persecution." <u>Id.</u> (citing 8 C.F.R. § 208.13(b)(1)).

[9] In his brief to this court, petitioner invokes "humanitarian asylum," a discretionary doctrine sometimes available even when there is little likelihood of future persecution. <u>See</u> <u>Waweru</u>, 437 F.3d at 205 ("[T]his is granted only in cases of 'extraordinary suffering . . . .'"); <u>see</u> <u>also</u> 8 C.F.R. § 208.13(b)(1)(iii)(A);

Accordingly, the petition for review is denied.

---

Matter of Chen, 20 I. & N. Dec. 16, 19-21 (BIA 1989).  Because this basis for relief was not previously raised, we do not consider it. See Olujoke v. Gonzales, 411 F.3d 16, 22-23 (1st Cir. 2005).