# United States Court of Appeals
## For the First Circuit

No. 06-1649

XUE DENG JIANG,

Petitioner,

v.

ALBERTO R. GONZALES, ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE BOARD

OF IMMIGRATION APPEALS

Before

Torruella, Selya, and Howard,
Circuit Judges.

Gary J. Yerman on brief for petitioner.
Peter Keisler, Assistant Attorney General, Civil Division,
Greg D. Mack, Senior Litigation Counsel, and Robbin K. Blaya,
Attorney, Office of Immigration Litigation, on brief for
respondent.

January 23, 2007

**SELYA**, **Circuit Judge**.  The petitioner, Xue Deng Jiang, seeks judicial review of a decision of the Board of Immigration Appeals (BIA), which affirmed an order denying his application for asylum, withholding of removal, or relief under the Convention Against Torture (CAT).  The petitioner claims that an adverse credibility determination is not supported by substantial evidence in the record and that the BIA erred in holding that he was not entitled to relief.  Concluding, as we do, that the BIA's decision is sustainable without regard to the disputed credibility determination, we deny the petition for review.

The facts are relatively uncomplicated.  The petitioner, a 25-year-old native and citizen of the People's Republic of China, arrived in the United States on November 4, 2003, without valid entry documentation.  The authorities immediately detained him.  Because he claimed to have been a victim of religious persecution in China, an immigration officer conducted an interview to assess his eligibility for asylum.

The petitioner told the interviewer that he had lived in Yutou Village with his parents who, like the petitioner, are practicing Catholics.  He explained, albeit without specifying a date, that he had attended a gathering of Catholic youths; that the local police had interrupted the gathering and attempted to arrest a Catholic priest who was in attendance; and that the petitioner helped the priest escape.

Fearing the consequences, the petitioner left the village and traveled approximately an hour to his aunt's residence in Fuzhou City. When he arrived, he heard that the police had visited his parents' abode in an effort to locate him. The petitioner never returned home and eventually made his way to the United States.

The petitioner told the immigration officer of his fear that, should he return to China, the police would arrest him, beat him, and make him reveal the priest's hiding place. He said that the police had told his mother (falsely) that he had assaulted a police officer, and that they threatened to shoot him if they were able to run him to ground.

The interviewer referred the petitioner to the Immigration Court, and he entered removal proceedings on November 12, 2003. See 8 U.S.C. § 1182(a)(7)(A)(i)(I). He conceded removability and cross-petitioned for asylum, withholding of removal, or protection under the CAT.

On his asylum application, filed May 11, 2004, the petitioner again described the events leading up to his departure from China. He added that these events occurred in July of 2001, and that the police had disrupted the gathering because it was an outgrowth of an "illegal church." He made no mention of any threat to shoot him but instead claimed that the police told his mother that if he did not "hand over the priest," he would be imprisoned.

-3-

An immigration judge (IJ) convened a hearing on May 12, 2005. During the hearing, the petitioner largely recapitulated the substance of his original asylum interview. He also claimed, for the first time, that the police arrested and interrogated his parents in an endeavor to learn his whereabouts. When asked why he had not mentioned his parents' arrest at any earlier time, he explained that he had not given "a lot of detailed information" in either the asylum interview or the asylum application.

On cross-examination, the petitioner reiterated that the police had threatened to shoot him if he did not betray the priest. When asked why he had omitted any mention of this threat from his asylum application, he explained that he had not learned about it until August of 2004. The cross-examiner quickly defenestrated this explanation, pointing out that the petitioner had first alluded to the threat of shooting in November of 2003. The petitioner thereupon reversed his field and admitted that he knew of the threat earlier; he asserted, however, that he was unsure whether the threat actually had been made until an August 2004 conversation with his parents.

In addition to his own testimony, the petitioner presented an affidavit signed by his father and a declaration signed by his parish priest in China.[1] These documents

[1]This declaration has some of the characteristics of an affidavit. It also contains sacramental history, apparently drawn from the parish's records. Nothing turns on how we label the

-4-

corroborated bits and pieces of the petitioner's story, particularly his status as a practicing Catholic and the happenings leading up to his abrupt departure from Yutou Village. However, neither document clarified the inconsistencies in the petitioner's account, such as whether the police had threatened his life or whether they had arrested his parents.

The proffer proved to be an exercise in futility. The IJ excluded the two documents on the ground that neither was properly authenticated in accordance with 8 C.F.R. § 287.6(b).

After hearing the evidence, the IJ noted that the petitioner had embellished his trial testimony by adding important information that was inexplicably omitted from his earlier statements. The IJ also noted the absence of any corroboration that any of this had ever happened. He proceeded to find the petitioner's testimony incredible. Having made this adverse credibility determination, the IJ concluded that the petitioner had failed to carry his burden of establishing a well-founded fear of persecution and, thus, had failed to show an entitlement to the requested relief.

On appeal, the BIA affirmed the IJ's ukase. It did not mention the IJ's exclusion of the affidavit and the declaration. Rather, in apparent disregard of that ruling, the BIA scrutinized the affidavit of the petitioner's father and concluded that it

document.

offered no corroboration of either the parents' alleged arrest or the supposed threat that the petitioner would be shot. Emphasizing these shortcomings, the BIA upheld the IJ's adverse credibility determination and, thus, the IJ's rejection of the petitioner's application for relief. The BIA held, in the alternative, that even if the petitioner's testimony was deemed credible, he had not made out a case for asylum or other redress. That decision precipitated the filing of this timely petition for judicial review.

The petitioner's argument is two-tiered: he maintains that the adverse credibility determination is not supported by substantial evidence and that, once his testimony is deemed credible, the record compels a finding of a well-founded fear of persecution (and, therefore, an entitlement to relief). We address the two halves of this argument separately.

We begin with the adverse credibility determination. This court reviews findings of fact in immigration proceedings, including findings with respect to credibility, to determine whether those findings are supported by substantial evidence in the record. Olujoke v. Gonzales, 411 F.3d 16, 21 (1st Cir. 2005). Under that standard, an adverse credibility determination may stand if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. §

1252(b)(7)(B)(i); see <u>Aguilar-Solis</u> v. <u>INS</u>, 168 F.3d 565, 569 (1st Cir. 1999).

Here, the petitioner argues that there is insufficient grounding for an adverse credibility determination. The record, however, reveals three separate articulated justifications for that determination. Taken as a whole, they comprise the platform on which the BIA's determination rests.[2]

First, the BIA observed that the petitioner's claim concerning his parents' arrest was of recent vintage and appeared to have been manufactured. That claim was not made either in the petitioner's asylum interview or his asylum application but surfaced only during his trial testimony.[3] The petitioner's counter is not convincing; he glosses over the interview, says that there was limited space available on the asylum application, and argues that the BIA should have excused this discrepancy on that basis.

---

[2]The IJ based the adverse credibility determination partially on a finding that the petitioner had not disclosed "any of the information that he testified to concerning his encounter with the police" either on his asylum application or during his initial asylum interview. From a literal standpoint, this finding was inaccurate; both the asylum application and transcript of the interview discussed the incident that allegedly occurred in July of 2001.

[3]Both the petitioner and the BIA characterized this discrepancy as an omission. It could equally well be characterized as an inconsistent statement inasmuch as the petitioner denied on his application that he or any family member had ever been arrested outside the United States.

This argument trenches on the frivolous. For one thing, the petitioner attached a two-page letter to his asylum application, thus exhibiting that he knew how to create space to include additional information. For another thing, even if the BIA could have reasoned as the petitioner advocates, it was not compelled to do so. See Tai v. Gonzales, 423 F.3d 1, 5 (1st Cir. 2005). Where there are two plausible but conflicting views of the evidence, the BIA's choice between them cannot be found to be unsupported by substantial evidence.

The second pillar that the BIA used to undergird the adverse credibility determination relates to the petitioner's testimony that the police threatened to shoot him if he did not surrender the priest. The BIA stressed that the petitioner had neglected to mention this threat on his asylum application. The petitioner initially attempted to explain the omission by claiming that he did not learn of this incident until August of 2004. When adroit cross-examination cut the ground from under that canard, he then switched gears and averred that he was unsure of the accuracy of what he had heard until August of 2004. Obviously, the BIA was under no obligation to credit a self-serving and wholly uncorroborated explanation that followed hard on the heels of an earlier lie.

In a related vein, the petitioner suggests that these and other inconsistencies identified by the BIA are trifling. He

reminds us that an adverse credibility determination "cannot rest on trivia but must be based on discrepancies that involved the heart of the asylum claim." Bojorques-Villanueva v. INS, 194 F.3d 14, 16 (1st Cir. 1999) (citation and internal quotation marks omitted).  The problem here is that the petitioner's conclusion does not follow from his premise: the critical inconsistencies in this case (e.g., what, if any, threats were made) are central to the petitioner's claims.

Third, the BIA concluded that the absence of corroboration undermined the petitioner's credibility.  The petitioner's rejoinder is that the IJ erroneously excluded corroborating material, such as the affidavit from his father and the declaration from his parish priest. We examine this rejoinder.

The IJ predicated the exclusionary ruling on 8 C.F.R. § 287.6(b), which provides a detailed procedure for the authentication of foreign official records for use in immigration proceedings.[4]  The petitioner argues that the documents at issue in this case are not official records and, thus, do not fall within the ambit of the regulation.  By its plain terms, the regulation applies only to foreign official records and not to all documents

---

[4]The regulation contains separate procedural requirements for records emanating from countries that are signatory to the Hague Convention and those emanating from non-signatory nations. Compare 8 C.F.R. § 287.6(c) with id. § 287.6(b).  China is a non-signatory nation. See Fed. R. Civ. P. 44, app. (2005).  Thus, subsection (b) pertains.

emanating from foreign sources. Courts have interpreted the regulation accordingly. See Cao He Ling v. U.S. Dep't of Justice, 428 F.3d 391, 405-06 (2d Cir. 2005). Because the father's affidavit is not by any stretch of the imagination an official record, the IJ erred in excluding it on this basis.

Less clear is whether the priest's declaration may come within the compass of the regulation. The term "official record" would most naturally appear to mean a government record — and there is nothing to indicate that the declaration satisfies that criterion. Some courts, however, have read 8 C.F.R. § 287.6 to include records kept in the ordinary course of business, over and beyond governmental records. See, e.g., Shah v. Attorney General, 446 F.3d 429, 433 (3d Cir. 2006) (employment identification card); Sviridov v. Ashcroft, 358 F.3d 722, 728 (10th Cir. 2004) (medical record). The priest's declaration appears to be, in part, such a record; it carries an ecclesiastical seal and chronicles the petitioner's religious history. But the document also contains a narrative statement, which appears to be the parish priest's account of the circumstances surrounding the petitioner's encounter with the authorities in July of 2001. Even those courts that have extended the reach of the regulation have not suggested that something like the declaration, which seems to be a mish-mash of information kept in the church's records and the parish priest's own version of the July 2001 incident, would qualify. Cf. Shah,

-10-

449 F.3d at 433 (indicating newspaper article is not an official record). We hold, therefore, that this document was also improperly excluded under 8 C.F.R. § 287.6.

We add, moreover, that even if either or both of these documents were "official records" within the meaning of 8 C.F.R. § 287.6, the regulation offers only a method — not the exclusive method — for authenticating a record in an asylum case. Circuit courts, including this one, have stated that noncompliance with the punctilio of 8 C.F.R. § 287.6 is not an absolute bar to the admissibility of a foreign document in an asylum hearing. See, e.g., Cao He Ling, 428 F.3d at 404; Gui Cun Liu v. Ashcroft, 372 F.3d 529, 532 (3d Cir. 2004); Yongo v. INS, 355 F.3d 27, 31 (1st Cir. 2003). While an IJ certainly can take into account the method of authentication in assessing a document's admissibility, reliability, and weight, the IJ in this case rejected the documents solely because they were not authenticated in strict conformity with the regulation. That was error.

As matters turn out, we need not determine the effect of this error.[5] The BIA offered an alternative ground of decision: it held that, even were the petitioner's testimony credible, he

---

[5]It may well be that the error was harmless. Notwithstanding the IJ's ruling, the BIA considered the documents (or, at least, the father's affidavit) in passing upon the case. Moreover, the documents, fairly read, fail to corroborate the claims that are of paramount concern here (for example, there is no mention in the father's affidavit of his or his wife's arrest).

-11-

nonetheless failed to prove an entitlement to any relief. As we explain below, that alternative ground — which is unaffected by the erroneous evidentiary ruling — merits our approbation.

An asylum-seeker bears the burden of proving that he is a refugee within the meaning of the immigration laws. See Olujoke, 411 F.3d at 21. A "refugee" is a person who cannot or will not return to his country of nationality "because of persecution or well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Fear of future persecution must be both objectively and subjectively reasonable. See Ang v. Gonzales, 430 F.3d 50, 57 (1st Cir. 2005). "That is to say, the asylum applicant's fear must be both genuine and objectively reasonable." Aquilar-Solis, 168 F.3d at 572. A court can set aside the BIA's resolution of such an issue only if the record indicates that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

Here, the petitioner contends that a series of occurrences — most conspicuously, the false accusation against him, the need to flee, the officers' threats, and his parents' arrest — lends credence to his fear of future persecution should he return to China.[6] The BIA found, however, that even if the petitioner

---

[6]The petitioner could have argued that these events constituted past persecution, proof of which would entitle him to a rebuttable presumption of future persecution. See, e.g., Orelien

testified truthfully, the evidence (including the documentary evidence) did not rise to the level needed to show a well-founded fear of future persecution on account of a protected ground.

What constitutes "persecution" is not statutorily defined in the asylum context. We have recognized that "it is in the first instance the prerogative of the Attorney General, acting through the BIA, to give content to [that term]." Topalli v. Gonzales, 417 F.3d 128, 132 (1st Cir. 2005). The BIA has eschewed generic rules for determining the incidence vel non of persecution, preferring instead to proceed on a case-by-case basis. See Orelien v. Gonzales, 467 F.3d 67, 71 (1st Cir. 2006). Courts typically defer to the BIA's view as to the existence or nonexistence of persecution in a given situation "unless that view amounts to an unreasonable reading of the statute or inexplicably departs from the BIA's earlier pronouncements." Id.

Despite the case-specific nature of the BIA's approach, decisional law has yielded a number of principles that have relatively broad applicability. We have acknowledged, for example, that persecution "requires that the totality of the petitioner's experiences add up to more than mere discomfiture, unpleasantness, harassment, or unfair treatment." Nikijuluw v. Gonzales, 427 F.3d

---

v. Gonzales, 467 F.3d 67, 71 (1st Cir. 2006). Withal, he has abjured any such claim. He argues only that these incidents demonstrate a well-founded fear of future persecution. While this strategic choice dictates our mode of analysis, it does not affect the result that we reach.

115, 120 (1st Cir. 2005). We also have acknowledged that, typically, persecution will manifest itself through a series of events rather than being confined to an isolated incident. See Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 124 (1st Cir. 2005).

In this instance, the BIA noted the vagueness of the petitioner's claim that Chinese authorities continued to hunt for him. It also noted that the petitioner had proffered no corroboration of this claim. Those observations are trenchant. Although the petitioner claimed (without any first-hand knowledge) that the police were still looking for him and that he would be arrested if he returned to China, those suppositions are totally unsupported; the record (including the disputed affidavit and declaration) contains no hard evidence that the police inquired as to the petitioner's whereabouts at any time after 2001. Then, too, the petitioner's claim was undermined by the fact that his parents, themselves practicing Catholics, continue to live in Yutou Village without discernible harassment of any kind. See Zheng v. Gonzales, 416 F.3d 97, 101 (1st Cir. 2005) (explaining that evidence of other members of the persecuted group living peacefully in their home country may undermine an alien's claim of persecution); Aquilar-Solis, 168 F.3d at 573 (similar). Finally, what evidence there is suggests that the petitioner's troubles in 2001 may have been related more to his own conduct in helping a wanted man to escape from the law and less to his religion as such. Cf. Silva v.

Ashcroft, 394 F.3d 1, 5 (1st Cir. 2005) (holding that an asylum-seeker must establish a causal link between one of the five protected categories and the alleged acts of persecution). Given the nature and extent of the evidence, we find fully supportable the BIA's conclusion that the petitioner did not carry his burden of proving a well-founded fear of future persecution.

Let us be perfectly clear. By any standard, the petitioner's account presents an unfortunate and doubtless unpleasant picture. At bottom, however, his claim of future persecution boils down to the sequela of a single incident that took place five years ago. Even if we credit his statements describing ongoing police interest in that incident, those statements are for the most part predicated upon second-hand information. Assuming an alien's credibility does not mean blindly assuming the credibility of his sources of information. See Nyonzele v. INS, 83 F.3d 975, 983 (8th Cir. 1998) (stating that even after assuming an alien's testimony is credible, "skeletal secondhand information [contained therein] will not satisfy the burden to demonstrate a well-founded fear [of persecution]").

In short, even if the petitioner testified truthfully, the BIA, on this chiaroscuro record, was amply justified in concluding both that the incident which took place in July of 2001 was an isolated event and that no reasonable prospect of future persecution remained. Thus, the record did not compel the BIA to

find that the petitioner had carried his burden of persuasion. See, e.g., Topalli, 417 F.3d at 132 (upholding a finding that multiple arrests, detentions, and beatings were isolated incidents and "not part of systematic maltreatment rising to the level of persecution"); Bocova v. Gonzales, 412 F.3d 257, 264 (1st Cir. 2005) (upholding a finding of no persecution where petitioner was arrested, beaten, and threatened with death); Nelson v. INS, 232 F.3d 258, 264 (1st Cir. 2000) (upholding a finding of no persecution where petitioner, on three occasions, was placed in solitary confinement and beaten, and received threatening telephone calls). For this reason, the petitioner's asylum claim fails.

The petitioner's remaining initiatives need not occupy us for long. A claim for withholding of removal imposes "a more stringent burden of proof on an alien than does a counterpart claim for asylum." Rodriguez-Ramirez, 398 F.3d at 123. Thus, the failure of the petitioner's quest for asylum dooms his quest for withholding of removal.

That leaves the petitioner's claim for protection under the CAT. To succeed on such a claim, an alien must show that it is more likely than not that he will be tortured if returned to his homeland. See Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir. 2004). "Torture is defined as any act by which severe pain and suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at

-16-

the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1).

In this case, the petitioner delineates the CAT standard but makes no reasoned argument to support a claim that the BIA erred in denying him protection. It is settled beyond peradventure that theories advanced in skeletal form, unaccompanied by developed argumentation, are deemed abandoned. See, e.g., Mazariegos v. Gonzales, 428 F.3d 30, 37 n.3 (1st Cir. 2005); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). That tenet applies here.

We need go no further. For the reasons elucidated above, we uphold the BIA's decision and deny the petition for judicial review.

**So Ordered**.