# United States Court of Appeals
## For the First Circuit

No. 16-2388

Yolanda OLMOS-COLAJ and CONSUELO OLMOS-COLAJ,

Petitioners,

v.

JEFFERSON B. SESSIONS, III,
ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Stahl, and Barron,
<u>Circuit Judges</u>.

<u>Ondine G. Sniffin</u> and <u>The Law Office of Ondine G. Sniffin</u>, for petitioners.
<u>Robert Michael Stalzer</u>, Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, with whom <u>Chad A. Readler</u>, Acting Assistant Attorney General, and <u>Julie M. Iversen</u>, Senior Litigation Counsel, were on brief for respondent.

March 29, 2018

**STAHL**, **Circuit Judge**.  The petitioners, Yolanda Olmos-Colaj ("Yolanda") and Consuelo Olmos-Colaj ("Consuelo"), natives and citizens of Guatemala, seek review of the denial of their applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  An Immigration Judge ("IJ") found petitioners' asylum applications to be untimely filed.  The IJ also found that petitioners failed to carry their burden of proof with respect to their withholding of removal and CAT claims.  The Board of Immigration Appeals ("BIA") adopted and affirmed the IJ's decision.  We deny the petition for review.

## I. Background

Consuelo and Yolanda, sisters and citizens of Guatemala, are members of an indigenous Mayan group called the Quiché. Consuelo entered the United States in 2000, followed by Yolanda in 2002.  Both relocated to New Bedford, Massachusetts, and lived in a community with other indigenous Quiché people.

On March 7, 2007, after an immigration raid on their place of employment, the Department of Homeland Security ("DHS") initiated removal proceedings against Consuelo and Yolanda.  Both conceded removability and with the assistance of counsel, filed for asylum, withholding of removal, and relief under the CAT.  On their I-589 forms, petitioners stated that they had not been aware of the filing deadlines for asylum applications.

On May 12, 2010, with the assistance of new counsel, petitioners filed revised I-589 forms. Consuelo's updated form indicated that she failed to file a timely application for asylum because she was "too afraid to ask for anything when I arrived. I didn't know asylum was an option for me and I certainly wasn't aware of the deadline."

In 2015, the IJ held a three-day hearing to allow petitioners to present their case. Consuelo, Yolanda, and Dr. Robert P. Marlin testified at the hearing. Consuelo and Yolanda's psychologist, Dr. Jessica Boyatt, was unavailable to testify, but the IJ accepted her written psychological evaluations into evidence without objection.

The testimony encompassed the following: the Guatemalan Civil War occurred during petitioners' childhood. Although no immediate members of their family were harmed, petitioners' "distant uncle" was murdered and their aunt and a cousin were raped. As a result of the level of violence, as well as threats made against petitioners' father, petitioners' mother decided to move the family to Santa Cruz. Petitioners' father remained in San Andrés to run his business.

Petitioners testified that they had a difficult life in Santa Cruz without their father. Non-indigenous people often discriminated against petitioners, calling them by the name "Trixie" -- an indigenous word for servant.

In Santa Cruz, Consuelo and her mother helped other indigenous women who were being abused by their employers. She explained that "[t]he police would come with Consuelo and her mother to help the women out, making the women's bosses pay them what was owed."

After attending school in Santa Cruz, Consuelo opened up a store of her own and hired Yolanda as an employee. Occasionally, people would throw rocks at the store and demand to know why an indigenous woman was running a business. Consuelo did not report the incidents to the police because she had no proof of the mistreatment. Consuelo testified that one day, members of the Barrio Norte gang, whom Yolanda referred to as "Ladinos," took some items from the store and refused to pay. One of the gang members hit Consuelo in the head with a rock -- she needed stiches for the wound, and a resulting scar was still visible at her hearing before the IJ. The gang also threatened to kill Consuelo if she did not learn her place. Petitioners reported the incident to the police and several of the gang members were arrested. After receiving threats against her life, Consuelo decided not to testify against her attackers and therefore, the men were released from custody.

In 1999, shortly after the incident with the gang, Consuelo closed her store and began teaching for an organization that traveled to native Quiché areas. Subsequently, on one

occasion while on her way to work, Consuelo was attacked by two unknown men. They grabbed her from behind and ripped her shirt. The men ran away when they heard other teachers approaching. Consuelo explained that she did not report the attack to the police because she did not have proof. A month after this attack, she stopped working as a teacher.

Consuelo testified that she came to the United States in 2000 because of the threats and humiliation she faced in Guatemala. She did not come earlier because her child was born in 1999. Her first boss in the United States treated her and the other employees poorly. He would make degrading comments about their undocumented status.

Yolanda testified that after Consuelo closed her store, she could not study anymore because Consuelo was her only support system. "The insults Yolanda received at school also influenced her to end her studies." After Yolanda and her then boyfriend, now husband, had a baby, they moved to Patzite and then to Jutiapa to live with her boyfriend's family. While visiting Santa Cruz for a festival in 2001, a "man grabbed Yolanda by the side and told her that he finally found her and that he did not forget that she sent him to jail." The other people around Yolanda were able to convince the man that she was not Consuelo. Yolanda told Consuelo about the incident over the phone and Consuelo told Yolanda that she should come to the United States. Because Yolanda

was breastfeeding her child at the time, she did not leave Guatemala right away.

In 2002, Yolanda, leaving her child behind, came to the United States and joined her sister in New Bedford, Massachusetts. She obtained a fake green card and social security card from a coyote. When Yolanda arrived, she was very sick, but explained that she did not go to a doctor because she was "avoiding immigration."

Yolanda and Consuelo testified that they filed for asylum after DHS officers arrested all of the illegal workers in the factory where they were employed. Consuelo testified that "she waited seven years to file her application because she was traumatized when she first arrived . . . . She did not speak English and the people she lived with when she first arrived did not know anything about asylum. . . . She was crying all of the time because she left her very small child back in Guatemala." Yolanda testified that she did not file her asylum application until 2007 because "she did not know she could apply for asylum until she was arrested."

Petitioners testified that several members of their family remain in Guatemala. Petitioners' mother is a homemaker, and their brother is a retired teacher and receives a pension from the Guatemalan government. Yolanda's daughter is currently

fifteen years old and lives in Guatemala with petitioners' brother. She attends a private school and Yolanda pays for her tuition.

In denying petitioners' applications for relief, the IJ determined that petitioners were credible "regarding the factual basis of their asylum claims." However, the IJ expressed "serious doubts about Consuelo's most recent explanation as to why she filed her asylum application approximately seven years after her arrival." At the hearing, Consuelo testified that she waited so long because "she did not have the right mindset at the time as she was traumatized from the things that happened to her in Guatemala." However, the IJ compared this testimony to Consuelo's original I-589 form from 2007, where she stated, "I was not aware of the filing deadlines" and to Consuelo's amended I-589 form from 2010, where she stated, "I was very afraid by what had happened to me and I didn't know I could ask for asylum." Based on these responses, the IJ determined that "Consuelo's testimony with respect to her reasons for missing the filing deadline was not credible."

The IJ concluded that neither Consuelo nor Yolanda demonstrated extraordinary circumstances warranting an extension to the 1-year filing deadline. The IJ stated, "as to both of the [petitioners], the Court cannot ignore the reality that the evasive nature of the [petitioners'] presence in the United States played a role in their continued ignorance of the filing deadline."

The IJ determined that in the alternative, even if the late filing were excused, petitioners' asylum applications would still be denied.  As to petitioners' claims of past persecution, the IJ found that the only two instances of harm presented -- their relocation as children and the attack on Consuelo in her store -- were not severe enough or with sufficient regularity to rise to the level of persecution.  The IJ also found that any harm suffered by Consuelo and Yolanda at the store was not the result of government action or inaction because the police were willing to assist Consuelo and in fact, had helped Consuelo and her mother to aid other indigenous women when their employers mistreated them.

Moreover, the IJ found that Consuelo and Yolanda did not establish a well-founded fear of future persecution.  The IJ explained that although their subjective fear was genuine, it was not objectively reasonable.  The IJ explained that the last of the threats took place some fourteen years ago, and the petitioners had presented no evidence as to whether their attackers were still alive or that they continued to hold a grudge.  Furthermore, the IJ described how petitioners' mother and brother live peacefully in Guatemala.[1]

---

[1] The IJ also found that Consuelo and Yolanda did not establish a "pattern-or-practice" claim because the "most current Country Reports reveal that violence in Guatemala is largely indiscriminate and that gangs do not necessarily target any particular social group."

- 8 -

Having found that Consuelo and Yolanda failed on their asylum claims, the IJ found that they could not prevail on their claims for withholding of removal or protection under the CAT.

On appeal, the BIA determined that the petitioners were not denied due process by the IJ. The BIA affirmed the IJ's decision, concurring with the IJ's finding that petitioners did not present extraordinary circumstances warranting an extension to the asylum filing requirements. The BIA also found that the IJ did not clearly err in the alternative findings that the petitioners failed to demonstrate past persecution, a well-founded fear of future persecution, or government inaction. As such, the BIA affirmed the IJ's denial of petitioners' asylum and withholding of removal claims, and protection under the CAT.

## II. Analysis

Consuelo and Yolanda petition for review of the BIA's decision upholding the IJ's denial of their applications for asylum, withholding of removal, and protection under the CAT. First, petitioners claim that the IJ denied them due process and a fair hearing because he was biased and prevented them from presenting expert testimony. Second, petitioners claim that they established extraordinary circumstances excusing their late asylum application filing. Finally, they argue that they demonstrated both a past and future fear of persecution, as well as government inaction. We address each claim in turn.

- 9 -

A. Due Process

Petitioners argue that the IJ compromised the fundamental fairness of the hearing by preventing petitioners' expert witness from testifying and by exhibiting bias. "We review the question of whether an [IJ's] conduct violates a party's due process rights de novo." Aguilar-Solis v. I.N.S., 168 F.3d 565, 568 (1st Cir. 1999).

With respect to petitioners' claim that the IJ refused to hear testimony from their expert witness, first, the IJ has a right to run a trial as he/she sees fit. See Albathani v. I.N.S., 318 F.3d 365, 375 (1st Cir. 2003) ("[T]he IJ's attempts to expedite proceedings are not the stuff of which a due process violation can be fashioned.") (internal quotation marks omitted). Second, petitioners have waived this issue. On the final day of the hearing, Dr. Bayatt was only available between noon and 1:00 p.m. Given that the hearing had already taken three days, and Dr. Bayatt's availability did not correspond with the regular hearing schedule of the court, the IJ proposed to accept an offer of proof that Dr. Bayatt would testify consistently with her written reports, which were included in the record. Petitioners' counsel acquiesced in the IJ's proposal.

As to petitioners' claim that the IJ exhibited bias by "excessive commentary about time and expediency," the Supreme Court has held that "expressions of impatience, dissatisfaction,

annoyance, and even anger," do not amount to bias. Liteky v. United States, 510 U.S. 540, 555-56, (1994). Petitioners' counsel represented to the IJ that the hearing would last, in total, approximately three hours. Thus, the IJ's frustration with a hearing that went on for three days was not without reason. Furthermore, despite the IJ's frustration, he clearly told the petitioners that "you can take as much time as you want." While the IJ warned the petitioners about the practical implications of the delay, specifically, that he was unsure about scheduling moving forward, the IJ also told petitioners' counsel that he was not trying to "cut down the amount of time" she spent with her clients. The BIA correctly determined that petitioners had an "ample opportunity to testify and present their case," as such, the IJ did not violate petitioners' due process rights.

## B. Asylum Filing

An asylum seeker must "demonstrate[] by clear and convincing evidence that the application [was] filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). If the 1-year filing requirement is not met, the government may consider an application "if the alien demonstrates . . . extraordinary circumstances relating to the delay in filing an application." 8 U.S.C. § 1158(a)(2)(D); see also Silva v. Gonzales, 463 F.3d 68, 71 (1st Cir. 2006).

- 11 -

Petitioners concede that they untimely filed their asylum applications,[2] but claim that they fall within the "extraordinary circumstances" exception. Petitioners argue that the IJ failed to credit evidence from their expert witness concerning how their psychological conditions affected their ability to timely file their asylum applications.

We do not have jurisdiction to review petitioners' challenge to this portion of the BIA's decision. This Court lacks "jurisdiction to review [an] agency's findings regarding timeliness or its application of the 'extraordinary circumstances' exception, 8 U.S.C. § 1158(a)(3), unless an alien identifies a legal or constitutional defect in the decision." Hana v. Gonzales, 503 F.3d 39, 42 (1st Cir. 2007). A constitutional defect challenge cannot be "a disguised challenge to factual findings." Pan v. Gonzales, 489 F.3d 80, 84 (1st Cir. 2007).

Here, the IJ found that neither petitioner qualified for the "extraordinary circumstances" exception to the 1-year filing deadline. Insomuch as this determination was made based on the IJ's credibility assessment of Consuelo, that determination is a finding of fact, and there is no basis by which we can review petitioners' claim. See Hana, 503 F.3d at 42. Likewise,

---

[2] Petitioners did not file their applications for asylum until 2007, more than six years after Consuelo entered the United States in 2000, and more than four years after Yolanda entered the United States in 2002.

petitioners' assertion that the IJ's decision not to have their expert testify resulted in a due process violation, is to no avail. As discussed above, the IJ's assessment of this issue did not violate petitioners' due process rights.  Therefore, we affirm the BIA's decision upholding the IJ's decision to deny petitioners' applications for asylum.

C. Withholding of Removal

Petitioners make a variety of arguments in their petition for review challenging the IJ and BIA's assessment of the asylum factors.  Because we find that petitioners cannot succeed on their asylum claim based on the jurisdictional bar described above, we consider petitioners' arguments only for purposes of analyzing their withholding of removal claim.  See Pan, 489 F.3d at 85 ("[T]he asylum and withholding of removal analyses are sufficiently analogous that we may treat the IJ's findings of raw fact on the asylum claim as transferable in large part to the withholding of removal claim.").  Petitioners' most relevant argument for purposes of this petition is that the BIA erred in upholding the IJ's finding that petitioners failed to demonstrate that they suffered past persecution or had a well-founded fear of future persecution.

Whereas here, the BIA agreed with the IJ's findings and conclusions, but added its own discussion, this Court reviews both decisions.  See Arias-Minaya v. Holder, 779 F.3d 49, 52 (1st Cir.

- 13 -

2015) ("Because the BIA adopted and affirmed the IJ's decision yet supplied its own gloss, we review the tiered decisions as a unit."). We review administrative findings of fact under the deferential substantial evidence standard of review. Matovu v. Holder, 577 F.3d 383, 386 (1st Cir. 2009). We must uphold the BIA's decision "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

"[W]ithholding of removal requires a higher likelihood of persecution than asylum." Aguilar-Escoto v. Sessions, 874 F.3d 334, 337 (1st Cir. 2017). "To obtain withholding of removal, an applicant must prove that upon return to his home country, he is more likely than not to face persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Silva, 463 F.3d at 72 (internal quotation marks omitted). As in a claim for asylum, an alien can demonstrate eligibility for relief by showing either that:

> (i) he has suffered past persecution on account of a statutorily protected ground, thus creating a rebuttable presumption that he may suffer future persecution if repatriated, or (ii) that it is more likely than not that he will be persecuted on account of a protected ground upon his return to his native land.

Lopez-Castro v. Holder, 577 F.3d 49, 52 (1st Cir. 2009) (internal quotation marks omitted).

"A petitioner must . . . show that the persecution is the direct result of government action, government-supported

- 14 -

action, or government's unwillingness or inability to control private conduct." Ly v. Mukasey, 524 F.3d 126, 132 (1st Cir. 2008) (internal quotation marks omitted); see also Arevalo-Giron v. Holder, 667 F.3d 79, 83 (1st Cir. 2012)(same). Petitioners claim that "[p]ervasive discrimination exists in all aspects of Guatemalan society [and that] [t]he government cannot protect Ms. Yolanda and Ms. Consuelo." However, substantial evidence supports the BIA's finding that petitioners "did not show that the government of Guatemala condoned the actions of the people that mistreated [petitioners] or that the Guatemalan government is unable or unwilling to protect [petitioners] from the people that they fear."

As to the harm suffered by petitioners in their past, in every instance in which petitioners sought help, the police responded to and assisted the petitioners. The record demonstrates that Consuelo and her mother used police assistance to help other indigenous women in their community. Likewise, after the attack on Consuelo in her store, the government attempted to prosecute the men who attacked her. While it is true that these men were released when Consuelo decided not to testify, the BIA correctly explained that the petitioner's decision to "forego prosecuting the people that harmed her because she feared retaliation by the perpetrators is not sufficient to show that the Guatemalan government is unable or unwilling to protect her." As for Yolanda,

she did not seek police assistance after she was threatened by a man who mistook her for her sister.

As petitioners cannot establish past persecution based on the lack of connection between any harm suffered and government action or inaction, petitioners' withholding of removal claim is dependent on their ability to show "a clear probability of future persecution." Lopez-Castro, 577 F.3d at 54. In upholding the IJ's finding that petitioners did not establish a well-founded fear of future persecution, the BIA explained that "the last threatening incident [experienced by Yolanda] occurred more than 14 years ago." Petitioners argue that the IJ's decision fails to account for the "current level of pervasive discrimination that continues to exist in present-day Guatemala." However, the IJ found that while petitioners submitted an "abundance of reports and articles" "summariz[ing] the violence and human rights abuses that have occurred in Guatemala over the last few decades," "[t]his evidence, while informative, does not speak to the particular and individualized fears asserted by [petitioners]." (citing Seng v. Holder, 584 F.3d 13, 19-20 (1st Cir. 2009)(superseded by statute on other grounds)). In affirming the IJ's decision, the BIA explained that petitioners' mother and brother, "who are of the same ethnicity, continue to live in Guatemala and no harm has befallen them." The substantial evidence in the record supports this determination, as such, we must uphold the BIA's decision.

This leaves only the petitioners' claim for protection under the CAT. However, because petitioners have failed to brief this argument in their petition for review, the argument is waived. See Jiang v. Gonzales, 474 F.3d 25, 32 (1st Cir. 2007) ("It is settled beyond peradventure that theories advanced in skeletal form, unaccompanied by developed argumentation, are deemed abandoned.").

The dissent spends many pages discussing the inadequacies of the IJ's and BIA's decisions. The IJ's twenty-nine page opinion more than adequately considered the arguments raised by the dissent. After a hearing that lasted three days, the IJ made the necessary findings based on the evidence presented. The BIA affirmed that decision, noting the relevant portions of the IJ's decision as it considered each and every issue raised on appeal. We again emphasize that we consider the petition for review under the substantial evidence standard. While the dissent acknowledges that the standard applies, as do all the parties to the action, it fails to consider that standard in presenting its arguments.

**III. Conclusion**

For all the reasons discussed, we deny the petition for review.

**-Concurring and Dissenting Opinion Follows-**

- 17 -

**BARRON, <u>Circuit Judge</u>, concurring in part and dissenting in part.**  I join the majority in rejecting Yolanda and Consuelo Olmos-Colaj's petition for review of their asylum and Convention Against Torture claims.  In my view, however, we should vacate and remand the petition so that the Board of Immigration Appeals (BIA) may reconsider the petitioners' withholding of removal claims.

The BIA, without adopting the decision of the Immigration Judge (IJ), determined, among other things, that the IJ did not clearly err when it found that the petitioners had failed to meet their burden to show that they had experienced past persecution and that, in consequence, the petitioners were not entitled to a presumption of having a well-founded fear of future persecution.  Accordingly, neither the BIA nor the IJ addressed whether, if the petitioners were entitled to that presumption, their withholding of removal claims should be denied.

The parties agree that we may uphold the IJ's finding that the petitioners did not meet their burden of showing that they had experienced past persecution -- and thus the BIA's ruling upholding that finding by the IJ -- only if the IJ's finding is supported by substantial evidence on the record as a whole.[3]  But,

---

[3] We explained in <u>Lin</u> v. <u>Mukasey</u>, 521 F.3d 22 (1st Cir. 2008), that, when the BIA determines that the IJ did not clearly err in making a finding without actually adopting the IJ's decision as its own, we potentially face a somewhat "metaphysical" question.  <u>Id.</u> at 26 n.1.  Do we review (presumably de novo) the BIA's legal conclusion that the IJ did not clearly err? Or do we review for

as I will explain, I do not believe that finding is sustainable on this record, even under the deferential substantial evidence standard. I thus conclude that the petition must be vacated and remanded so that the BIA may give further consideration to those issues concerning the petitioners' withholding of removal claims that the agency has not yet addressed.

## I.

To show that they are entitled to a presumption that they have a well-founded fear of future persecution based on their past persecution, the petitioners point to painful experiences that they endured as children during the Guatemalan Civil War and that they suffered as adults in Guatemala after that civil war ended. I thus now consider this evidence, which the IJ found to be credible.

## A.

We have recognized that, during the Guatemalan Civil War, "Mayan communities . . . became a military objective." Ordonez-Quino v. Holder, 760 F.3d 80, 89 (1st Cir. 2014) (internal

---

substantial evidence the "underlying findings of facts themselves"? Id. But, we had no occasion to resolve that fine question of administrative law in Lin. See id. And we have no need to do so here either, as the parties agree that we should review the IJ's determination that the petitioners failed to meet their burden of showing past persecution for substantial evidence. Accordingly, like the parties, I focus on whether substantial evidence supports the IJ's finding that the petitioners failed to meet their burden to show past persecution.

citations and alterations omitted); see also Perez Calmo v. Mukasey, 267 F. App'x 640, 641 (9th Cir. 2008) ("Mayans, as a group, were identified by the Guatemalan army as guerrilla allies and were targeted for extinction." (internal citation omitted)). And, here, the uncontradicted record shows that the petitioners, who are members of a Mayan ethnic group known as the Quiché, were displaced from their home during the war due to concerns for their safety after, also during the war, a number of aunts, uncles, and cousins were either killed, raped, or tortured and their father was forced to flee from their village.

It is true that, as the IJ noted, these petitioners, unlike the petitioner in Ordonez-Quino, were not themselves physically injured in the civil war and did not themselves personally view others being so injured, see 760 F.3d at 91-92. But, the petitioners rightly point out that we held in Ordonez-Quino that "[w]here the events that form the basis of a past persecution claim were perceived when the petitioner was a child, the fact-finder must 'look at the events from [the child's] perspective, [and] measure the degree of [his] injuries by their impact on [a child] of [his] age.'" Id. at 91 (quoting Hernandez-Ortiz v. Gonzales, 496 F.3d 1042, 1045 (9th Cir. 2007) (alterations in original)). And, we further emphasized in Ordonez-Quino that the BIA must take the "harms [a child's] family suffered into account" and consider them "from the perspective of a child" in

- 20 -

determining whether those childhood experiences amounted to persecution.  Id. at 92.  Nor are we unique in adopting this context-sensitive approach to assessing whether childhood wartime experiences amount to persecution.  See Jorge-Tzoc v. Gonzales, 435 F.3d 146, 150 (2d Cir. 2006) (concluding that where the petitioner had not personally been "victimized" by the killings that occurred in the course of a massacre in his Mayan village during the Guatemalan Civil War, "[b]ecause the IJ failed to take into account significant evidence and to address the harms [the petitioner] and his family incurred cumulatively and from the perspective of a small child," the BIA's finding on past persecution was not sustainable on a record that showed, among things, that the petitioner had been forced to relocate with his family due to the wartime violence in his village).

Thus, although the majority does not address this issue, in my view, the IJ erred by concluding, in effect, that the harm that the petitioners suffered during the civil war was too slight to constitute persecution because the petitioners did not endure harm as severe as that endured by the petitioner in Ordonez-Quino during that same war.  We simply did not hold in Ordonez-Quino that the extreme harm suffered by the petitioner there constituted a threshold of wartime childhood trauma that must be met.  And I cannot see how substantial evidence supports the conclusion that the traumatizing wartime experiences that the petitioners did

credibly recount, which included their family's forced relocation to escape the extreme violence visited upon a number of close family members, would not engender in a child, at least presumptively, a well-founded fear of being persecuted in Guatemala in the future.

Of course, the harm that the petitioners suffered during the war must still have a nexus to their Quiché ethnicity. It is their membership in that "social group," after all, that grounds their past persecution claim. And the IJ did state in a somewhat cryptic footnote that the harm that the petitioners suffered as children during the war was "attenuated" from their asserted protected identity. The IJ did not, however, appear to retreat in any clear way from its statement earlier in its opinion that it assumed "that the [petitioners] have established a sufficient nexus between the mistreatment that they suffered in Guatemala and their identity as indigenous Mayan women." Accordingly, I read the IJ -- and thus the BIA in finding that the IJ did not clearly err[4] -- to have assumed that the petitioners had satisfied the

---

[4] The BIA issued a blanket ruling affirming the IJ's conclusion that the petitioners did not meet their burden to show that their past experiences rose to the level of persecution without separately discussing the petitioners' allegations of mistreatment as, respectively, children and adults. In issuing that blanket ruling, moreover, the BIA offered just one additional sentence that asserted in conclusory fashion that the harm described by the petitioners was not severe enough to rise to the requisite level. The BIA did append to that sentence a long string cite of supporting citations to our past precedents, but, in doing

nexus requirement and to have rejected their past persecution claims based on their childhood experiences only because the harm they suffered at that time was too slight to rise to the level of persecution when compared to the harm suffered by the petitioner in Ordonez-Quino.  Nor does the government argue otherwise in its briefing to us.

In so concluding, I recognize that, to show past persecution, the petitioners also must show that the harm that they suffered during the civil war -- even if that harm is severe enough to constitute persecution and has a nexus to their Quiché identity -- was attributable to the Guatemalan government.  See Ly v. Mukasey, 524 F.3d 126, 132 (1st Cir. 2008).  But neither the IJ nor the BIA made a finding that the petitioners had failed to make that showing.  Thus, we may not sustain the rulings of the IJ and the BIA rejecting the petitioners' claims of past persecution as children on the basis of any such failure on the petitioners' part. And that is so even if, as the majority concludes, see Maj. Op. 15-18, substantial evidence supports the entirely distinct finding that the IJ made (and that the BIA affirmed) that the petitioners

---

so, the BIA did not purport to engage in any meaningful way with the evidence that the petitioners put forth concerning the severity of the harm that they did suffer.  Accordingly, I focus on the IJ's ruling as to past persecution, since if that ruling cannot be sustained as being supported by substantial evidence, then I do not see how the BIA's ruling that the IJ did not clearly err in finding that the harm the petitioners experienced was not severe enough to constitute persecution can be sustained either.

failed to meet their burden to show that the harm that they suffered as adults was not attributable to the Guatemalan government. See Maj. Op. 15. For that finding as to the responsibility of the Guatemalan government for events that occurred after the civil war simply does not bear on whether the government was responsible for events that occurred during the war itself.

In sum, given the severity of the harm that the petitioners credibly recounted that they experienced as children during the civil war, I cannot conclude that substantial evidence supports the IJ's and the BIA's decisions finding that the harm that the petitioners suffered -- especially when considered from a child's perspective -- was too insignificant to amount to past persecution. And, as the IJ and the BIA offered no other basis on which we may reject the petitioners' claims that their experiences as children during the Guatemalan Civil War constituted past persecution, I thus conclude that, in accord with SEC v. Chenery Corp., 332 U.S. 194 (1947), and Aldana-Ramos v. Holder, 757 F.3d 9 (1st Cir. 2014), we should remand the petition.

That way, the BIA may consider in the first instance whether -- given that the petitioners sufficiently demonstrated that the harm they suffered as children during the civil war was severe enough to constitute persecution -- the petitioners have satisfied the nexus requirement with respect to those experiences

and have otherwise shown what they must in order to support their claims that they suffered past persecution as children. For, if the petitioners can make a showing of past persecution based on their childhood experiences in the war, then for purposes of their withholding of removal claims, "it shall be presumed that the applicant's life or freedom would be threatened in the future[.]" 8 C.F.R. § 1208.16(b)(1)(i). And, in that event, their withholding of removal claims may be denied only if the government can show by a preponderance of the evidence, which the government has not yet purported to do, "that fundamental changes have occurred that have removed any threat to an applicant's life or freedom or that relocation to another part of the proposed country of removal would be safer and reasonable." Un v. Gonzales, 415 F.3d 205, 208 (1st Cir. 2005); see 8 C.F.R. § 1208.16(b)(1)(i).

I note in this regard that, as Ordonez-Quino recognized, the fact that, quite obviously, the civil war in Guatemala has ended is not in and of itself proof of a change in circumstances that would suffice to overcome the presumption of a well-founded fear of future persecution. Ordonez-Quino, 760 F.3d at 93 (noting that while the "guerrillas had been integrated into the government after the civil war and no longer engaged in militant activities" the record contained "significant documentation of ongoing systemic racism and human rights violations against the Mayan Quiché community"). Thus, we may not deny the petition for review

with respect to the BIA's and the IJ's rulings rejecting the petitioners' withholding of removal claims based simply on the fact that it is clear that the civil war is over.

Moreover, the IJ and the BIA did not address whether, in the event that the petitioners demonstrated that they had experienced past persecution and were thus entitled to a presumption that they have a well-founded fear of future persecution, the government could overcome that presumption. Thus, issues concerning whether the government has put forth sufficient evidence to overcome a presumption of past persecution to which the petitioners may be entitled should be addressed in the first instance by the agency on remand, insofar as the agency concludes that the petitioners have met their burden of showing past persecution and thus are entitled to that presumption.

**B.**

I also conclude that we must remand the petition for further consideration of the sisters' separate contention that they suffered past persecution as adults and thus are entitled to withholding of removal. The petitioners credibly recounted that, while living in Guatemala in the late 1990s, members of a local gang repeatedly entered the store which Consuelo owned and at which Yolanda worked and harassed the sisters because of their Quiché ethnicity. The petitioners also credibly claimed that, one day during that period, gang members came into the store when both

- 26 -

sisters were present, robbed the store, called the petitioners ethnic slurs based on their Quiché ethnicity, threatened to kill Consuelo, and threw a rock at Consuelo's head that struck her.

Consuelo's head injury was serious enough to cause a "severe hemorrhage." In fact, the resulting scar was still visible at the hearing before the IJ.

Consuelo and Yolanda reported the incident to the police, and the perpetrators were arrested. Thereafter, however, Consuelo received another in-person death threat due to her role in the gang members' arrest, and she closed the store because of that threat and dropped the charges.

In 2001, moreover, after Consuelo had already come to the United States, Yolanda was attacked and threatened at a festival in Guatemala. The attacker, apparently mistaking Yolanda for Consuelo, grabbed Yolanda and said, "[t]riche [an ethnic slur for Quiché], I finally found you . . . . Did you really think that I was going to forget what you did to me? They sent me to jail for that." When bystanders informed the attacker that the woman that he had grabbed was Yolanda, not Consuelo, the attacker told Yolanda:

> [Y]ou're going to be the one that's going to
> pay for it. Some people have told me that
> your sister's gone to the United States. But
> tell your sister that when she comes back, I'm
> going to be waiting for her here. And if not
> her, then I'll kill you. Tell her that if

it's not going to be her, then I'll find you
and I'll kill you.

Fearing for her life, Yolanda fled to the United States a few months later, as soon as her infant daughter was weaned.

There is no bright line rule as to when "the sum of an alien's experiences" rises to the level of persecution. Lopez de Hincapie v. Gonzales, 494 F.3d 213, 217 (1st Cir. 2007). But, the petitioners credibly recounted that they were jointly threatened with death by armed attackers at the store and that the assailants, because of the petitioners' Quiché ethnicity, threw rocks at the sisters and that one of the rocks seriously injured Consuelo. In addition, the death threat that Consuelo received after filing the police report was likewise specific and credible. In fact, in the wake of that threat, the petitioners closed their store and Consuelo ultimately fled the country. Finally, the threat that Yolanda received at the festival was also made in person, specific, accompanied by a forceful grab, and credible enough that she, too, fled the country shortly thereafter.

I thus cannot conclude that substantial evidence supports the IJ's and the BIA's rulings that the petitioners failed to meet their burden to show that, as adults, they were subject to harm severe enough to rise to the level of persecution.[5] We have

------

[5] As discussed supra at note 2, the BIA did issue a blanket ruling affirming the IJ's conclusion that the petitioners did not meet their burden to show that their past experiences rose to the

held that "threats of murder . . . fit neatly under this carapace [of persecution]."  Id.; see also Un, 415 F.3d at 210 ("[C]redible verbal death threats may fall within the meaning of 'persecution.'").  And we have said that this is especially true where specific threats are "bolstered by violence," Javed v. Holder, 715 F.3d 391, 396 (1st Cir. 2013), and when the threats are made "in person, and with a weapon." Sok v. Mukasey, 526 F.3d 48, 54 (1st Cir. 2008).

In finding that the threats were not severe enough to support the sisters' claims of past persecution, the IJ did note that "the [petitioners] continued to live in Guatemala for a number of years without those attacks ever being fulfilled."  But, evidence that the target of a death threat stopped pursuing justice against her attackers to avoid being killed by those same attackers hardly supports the conclusion that the death threat was not severe enough to ground a claim of past persecution.  Thus, the fact that Consuelo remained in the country after she was threatened is no indication that she did not have reason to fear for her life.  See Lopez-Galarza v. I.N.S., 99 F.3d 954, 962 (9th Cir. 1996) (holding

---

level of persecution.  But, it did so without separately addressing the petitioners' claims based on their childhood and adult experiences.  Thus, for the same reasons that I have set forth in that footnote, I focus on the IJ's ruling as to whether the petitioners suffered past persecution as adults, because, if that ruling cannot be sustained, then I do not see how the BIA's ruling upholding it can be.

- 29 -

that the fact that "the petitioner remained in Nicaragua for eight years [after being attacked] . . . [was] not relevant to . . . her past persecution . . . since that persecution had already taken place, and remaining did not lessen its severity"); see also Nakibuka v. Gonzales, 421 F.3d 473, 477 (7th Cir. 2005) ("[A]n asylum applicant's decision not to flee her home country immediately does not mean that she was not persecuted."); cf. Sok, 526 F.3d at 51, 54-56 (concluding that IJ's finding of past persecution was not supported by substantial evidence although the petitioner did not leave the country until four years after she first began receiving threats); Ajanel v. I.N.S., 79 F. App'x 968, 969 (9th Cir. 2003) (concluding that unfulfilled death threats coupled with acts of violence against other members of the asylum seeker's social group constituted past persecution).

In fact, after Consuelo eventually did flee the country, the attackers still found Yolanda -- mistaking her for Consuelo -- and repeated the threat that they had given earlier. This time, though, the threat was made without any conditional caveat that might allow Yolanda to comply with it in a manner that would permit her to remain in the country without the death threat being carried out. And, in keeping with the petitioners' contention that these death threats were serious, Yolanda fled the country soon after this unconditional threat was given.

In my view, therefore, the key issue concerns the further finding that the IJ made and on which the majority relies to sustain the ruling by the IJ and the BIA that the petitioners had failed to show that they suffered past persecution. See Maj Op. 15-18. In that further finding, the IJ determined that, even assuming that the harm that the petitioners suffered as adults was severe enough to rise to the level of persecution, the petitioners still failed to demonstrate the requisite connection between the action or inaction of the Guatemalan government and that harm. And thus, the IJ ruled, their claims of past persecution failed for that independent reason.

The IJ's finding on that score relied on the fact that the petitioners testified that, "as soon as the police were informed" about the attack at the store, "they arrested at least some of [their] assailants and initiated criminal proceedings against them." The IJ recognized that -- "given her fears at the time" -- Consuelo's decision to drop the charges against those of her assailants who had been arrested "may have been a reasonable one[.]" But, the IJ nevertheless determined that Consuelo's decision to drop those charges "cannot be attributed to the Guatemalan government."

Although the majority concludes that substantial evidence supports this finding, see Maj. Op. 15-16, in my view, the IJ's reasoning in reaching this determination is unwarrantedly

categorical. The IJ did not address the possibility that the record might contain evidence that would suffice to satisfy the petitioners' burden of showing that the government of Guatemala was not able (even if it was willing) to protect the petitioners from their attackers in the event that the sisters chose to pursue the charges against their attackers rather than to drop them in the face of threats.

The IJ did note that the petitioners testified that the police on a number of occasions "actually assisted Consuelo in her efforts to ensure that the rights of other indigenous Mayan women were enforced and recognized by others[.]" But, that evidence of the government's willingness to provide assistance in the distinct context of addressing concerns about employment discrimination is simply one part of the record as a whole.

Thus, the IJ was required to weigh that evidence against any countervailing evidence that the petitioners put forward to show that the Guatemalan government was unable to protect them from the ethnically-motivated attacks and threats by the gang that attacked them. Of course, the government does not bear the burden of proving that it was not responsible for the harm to which the sisters were subjected by the gangs; the petitioners do. Pulisir v. Mukasey, 524 F.3d 302, 308 (1st Cir. 2008). And, the BIA is entitled to deference in evaluating the relative strength of any

evidence that the petitioners put forth of the government's responsibility.

But, as the petitioners point out, they did put forth affirmative evidence of the Guatemalan government's inability to protect them in the form of evidence detailing the Guatemalan government's "long and disturbing history" of not protecting indigenous Guatemalans -- and the Quiché in particular -- from harm (and, indeed, of perpetuating such harm). And yet, as the petitioners also point out, neither the IJ nor the BIA addressed that evidence in connection with the petitioners' contention as to their past persecution claims that, in light of that disturbing history, the Guatemalan government could not protect the sisters from their attackers.

The failure of the IJ and the BIA to address this critical evidence precludes me from concluding that substantial evidence supports their conclusions that the petitioners failed to meet their burden to show that the Guatemalan government was responsible -- if only through inaction -- for the severe harm that they suffered as adults. In reviewing agency findings for substantial evidence, we are required to consider the record as a whole and not merely to consider that evidence in the record that lends support to the agency's finding. See Matovu v. Holder, 577 F.3d 383, 386 (1st Cir. 2009). And, thus, if there is potentially countervailing evidence in the record that the agency has simply

not addressed in denying a claim for relief, then the appropriate course is to vacate and remand the petition for review so that the agency may consider that unaddressed evidence in the first instance. See Aldana-Ramos, 757 F.3d at 18 (determining that the failure of the BIA and IJ to "ever address" salient portions of the record "is insufficient" to permit its ruling to be sustained as supported by substantial evidence).

Thus, I conclude that we must vacate and remand the petition so that the agency may do what it has not yet done -- assess and explain whether the petitioners' historical evidence satisfies their burden of showing that the Guatemalan government is responsible, even if only through inaction, for the severe harm that the petitioners suffered as adults. For, if the petitioners can meet that burden, and otherwise show what they must to establish that they were persecuted as adults, then they are entitled to a presumption that their "li[ves] or freedom would be threatened in the future." 8 C.F.R. § 1208.16(b)(1)(i). And the government would then be entitled to deny them withholding of removal only by overcoming that presumption, something that the government has not yet attempted to do.[6]

---

[6] In a paragraph that begins by holding that the IJ "did not clearly err in finding that the [petitioners] did not establish a well-founded fear of future persecution in Guatemala," the BIA did state that the IJ "correctly determined that [the petitioners] did not show that . . . the government of Guatemala is unable or unwilling to protect them from the people that they fear." In so

## II.

For the foregoing reasons, I respectfully dissent as to the petitioners' withholding of removal claims.

---

holding, the BIA determined that the IJ did not clearly err in finding that, because new Guatemalan police academies opening in "largely indigenous areas" would "increase the number of indigenous police officers," the petitioners had not met their burden of showing that they had a basis for fearing future persecution. That determination, though, did not purport to provide a basis for upholding the BIA and IJ's rulings rejecting the petitioners' claims of past persecution; nor did it address the issue of whether the government would be able to overcome a presumption of a well-founded fear of future persecution in the event that the petitioners demonstrated that they had experienced past persecution.